Cornelius **MARSHALL,**
**Plaintiff–Appellee,**

**v.**

**Wilbert ALLEN, Richard Anderson, and Anthony J. Fusco, Jr., Defendants–Appellants.**

**No. 91–1933.**

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1992.

Decided Jan. 22, 1993.

Rehearing Denied Feb. 25, 1993.

Mary Stowell, Linda Friedman (argued), Richard C. Leng, Leng, Stowell, Friedman & Vernon, Chicago, IL, for plaintiff-appellee.

Thomas E. Johnson, Phillip H. Snelling, Asst. Corp. Counsel (argued), Johnson, Jones & Snelling, Chicago, IL, for defendants-appellants.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

■ This case presents an interlocutory appeal from the district court's order denying summary judgment on a claim of qualified immunity. This court has jurisdiction to hear this claim under *Mitchell v. For-*

---

1. Our opinion will refer throughout to the First Amendment rather than to the First and Fourteenth Amendments. The First Amendment has been made applicable to the states through the Fourteenth Amendment and it is the Fourteenth Amendment that applies to state, not federal, actors. Thus, our denomination in this opinion

*syth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), which held that a district court's denial of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 (1988). *Accord Gorman v. Robinson,* 977 F.2d 350, 354–55 (7th Cir.1992); *Elliott v. Thomas,* 937 F.2d 338, 340–41 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). The district court concluded that genuine issues of material fact existed as to whether the defendants—the Chicago Housing Authority (CHA) and three supervisory attorneys in its Legal Department, Wilbert Allen, Richard Anderson, and Anthony Fusco—fired Cornelius Marshall from his job as an attorney in retaliation for actions that were protected by the First Amendment.[1] The court also held that, when Mr. Marshall was discharged in June 1988, the law was sufficiently clear to establish that the defendants' alleged conduct violated Mr. Marshall's First Amendment rights. Consequently, the district court denied defendants' claim that they were entitled to qualified immunity. Messrs. Allen, Anderson, and Fusco appeal and, for the following reasons, we affirm.

## I

## BACKGROUND

### A. *Facts*

The parties rigorously dispute many of the facts in this case. However, the sole issue before this court is whether the defendants are entitled to summary judgment on the issue of qualified immunity. As will be discussed more fully below, our review is limited to this question. Consequently, many of the factual disputes that the parties raise are immaterial to the resolution of this issue and need not be addressed by this court.[2] A brief summary follows of

is technically imprecise, but continues a conventional and convenient practice. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 n. 3 (7th Cir.1991).

2. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (stating that only disputes over facts that

the facts relevant to the defendants' claim of qualified immunity.

From April 1983 until his discharge in June 1988, Cornelius Marshall was an attorney in the CHA's Legal Department. In June 1988, defendant Wilbert Allen was the CHA's Acting General Counsel; Anthony Fusco served as Deputy General Counsel for Contracts and Complex Litigation; and Richard Anderson was Acting First Deputy General Counsel. These are supervisory positions in the department's organizational scheme.

In 1986, four women attorneys, Countess Cary, Irene Lyons, Ann Breen Greco, and Sue Ann Rosen, began to voice complaints about unequal pay and working conditions in the Legal Department. In February 1987, these women (known collectively as "the Cary plaintiffs") filed charges with the EEOC. They alleged that the CHA, James Thomas (then the CHA's General Counsel), and Wilbert Allen had violated Title VII and the Equal Pay Act by engaging in gender discrimination in establishing salaries, promotions, work assignments, training opportunities, and "professional courtesies." R. 45 at Ex. 19. In August 1987, these charges ripened into a law suit in federal court. *Carey v. Chicago Hous. Auth.*, No. 87 C 6998 (N.D.Ill. filed August 7, 1987).

In February 1987, after the Cary plaintiffs had filed charges with the EEOC, James Thomas, as General Counsel, issued a memo advising the Legal Department's staff that the Cary plaintiffs could not represent the CHA on any employment-related matters or on any matters in which their attorney, who also represented other clients with interests adverse to the CHA, was involved. The memo also directed the staff not to discuss employment-related cases with the Cary plaintiffs and to consult with supervisors if any question about such disclosures should arise. It concluded by stating that this new policy was not intended to reflect on the integrity of the

Cary plaintiffs and was not meant to disrupt non-employment relations. The defendants claim that this memo built a "Chinese Wall" around the Cary plaintiffs in order to comply with the Code of Professional Responsibility. Mr. Marshall asserts that its effect was to signal other members of the Legal Department's staff that they were to "keep a distance" from the four women. Appellee's Br. at 11.

Mr. Marshall alleges that, in the wake of the "Chinese Wall" memo, the Cary plaintiffs were ostracized by Legal Department staff members, who feared for their jobs. He also asserts that Messrs. Allen, Fusco, and Anderson turned their attention to firing the Cary plaintiffs. The defendants do not agree with these claims. Nonetheless, it is undisputed that the Cary plaintiffs were suspended from the CHA on January 29, 1988, and that they were discharged on March 4 of that same year. Following the suspensions, several women's interest organizations held a press conference in support of the four attorneys. The suspensions and the firings also prompted numerous stories in Chicago newspapers.

Mr. Marshall was discharged on June 20, 1988. The stated reason for his dismissal was poor job performance, although he claims that the real cause was his support for the Cary plaintiffs in their dispute with the CHA. As evidence of this support, Mr. Marshall cites a number of instances in which he allegedly spoke in favor of the Cary plaintiffs and their claims, or otherwise assisted them. These include: (1) a December 1986 statement to James Thomas suggesting that the Cary plaintiffs should be given a forum in which to air their grievances; (2) a December 1987 statement in a private meeting with Mr. Fusco disputing Mr. Fusco's assessment of the legal skills of two of the Cary plaintiffs; (3) statements made to the CHA's outside counsel on the day of his discharge indicating his belief that the Cary plaintiffs' claims had merit; and (4) the fact that he shared information with the Cary plain-

---

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989) (stating that the

"existence of disputed facts which do not affect the outcome will not preclude summary judgment").

tiffs about a promotion he received, which presumably helped them prepare their case against the CHA. In addition, Mr. Marshall asserts that he continued to associate with the *Cary* plaintiffs after the "Chinese Wall" memo had been issued and they allegedly had been stigmatized, and that, during this period, he made favorable comments about them to co-workers. He also claims that he was identified as a supporter of the *Cary* plaintiffs in pleadings and depositions generated during the course of the *Cary* litigation. On May 27, 1988, shortly after he had learned that Messrs. Fusco and Allen were recommending his termination, Mr. Marshall filed a charge with the EEOC, alleging retaliation. As noted above, he was officially terminated on June 20.

## B. *District Court Proceedings*

On June 20, 1989, Mr. Marshall filed a five-count complaint against the CHA and Messrs. Allen, Anderson, and Fusco in the United States District Court for the Northern District of Illinois. Count I alleged that his discharge had been in retaliation for his support of the *Cary* plaintiffs, and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) (1988), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) (1988). Count II brought a claim under 42 U.S.C. § 1983 (1988), alleging that his discharge violated his First Amendment rights of free speech and free association. Count III claimed that Mr. Marshall had been deprived of a property interest in his employment without due process of law. Counts IV and V alleged state law breach of contract and intentional infliction of emotional distress. After the close of discovery, all defendants moved for summary judgment on all counts. In addition, Messrs. Allen, Anderson, and Fusco sought qualified immunity on the federal law claims. The district court granted summary judgment in favor of all defendants on the due process count and on the state law breach of contract and tort counts. However, it denied summary judgment on Count I, the Title VII and Fair Labor Standards Act claims, on the ground that Mr. Marshall had submitted sufficient

facts to support a claim of retaliation. The court likewise denied summary judgment on Count II, the First Amendment claims, concluding, with regard to the free speech claim, that Mr. Marshall "has presented sufficient facts to raise a factual dispute as to whether the matters he spoke out on were of public concern. Factual disputes also exist as to whether [he] was fired for this speech." Mem.Op. at 5 (footnote omitted).

Messrs. Allen, Anderson, and Fusco's claims for qualified immunity were likewise denied. The district court held that this court's decision in *Auriemma v. Rice*, 910 F.2d 1449 (7th Cir.1990) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991), demonstrated that, at the time of the supposed retaliation, it was clearly established that Mr. Marshall's alleged speech was protected by the First Amendment. In addition, the court determined that the defendants had waived any affirmative defense to Mr. Marshall's free association claim by not adequately addressing it in their pleadings. The court also concluded that the law was clear in 1988 that supervisors could be liable for retaliation under Title VII and the Fair Labor Standards Act.

## II

## ANALYSIS

### A. *Appellate Jurisdiction*

■ Mr. Marshall asserts that, as a threshold matter, this court has no jurisdiction over this case because the claims brought by the defendants are beyond the limited appellate review allowed from a denial of qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir.1992) (quoting same language from *Harlow*); *Green v. Carl-*

*son,* 826 F.2d 647, 649 (7th Cir.1987) (same). The focus of this defense is on the

> "objective legal reasonableness" of the actions taken by the defendants. *Anderson v. Creighton,* [483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)]. Actions taken by local officials are considered objectively unreasonable only if the right allegedly violated is clearly established in a sufficiently particularized sense at the time of the actions at issue.

*Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir. 1992). Essentially, qualified immunity is a defense "contingent on the state of the law." *Elliott,* 937 F.2d at 341. If it were not clearly established that their conduct violated the law at the time the officials allegedly acted, then they are entitled to qualified immunity. *Siegert v. Gilley,* —— U.S. ——, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).

The Supreme Court has held that, in addition to providing a defense to liability, qualified immunity entitles a state official to avoid standing trial or facing the other burdens of litigation. *Mitchell,* 472 U.S. at 526–27, 105 S.Ct. at 2815–16. Consequently, a decision of the district court denying qualified immunity is immediately appealable. *Id.* However, the issues that we may address on an appeal from a denial of qualified immunity are limited, and, in several recent decisions, this court has articulated the boundaries of the inquiry allowed on this type of appeal. In *Elliott,* 937 F.2d at 342, we held that an interlocutory appeal is not available to a defendant who raises a defense on the merits, that is, a claim that he did not engage in the illegal conduct of which he has been accused. Such a claim does not implicate the state of the law at the time that the defendant allegedly acted, but rather raises the factual question of what the defendant did or did not do. Therefore, this latter defense is beyond the narrow legal issue that *Mitchell v. Forsyth* identified as subject to immediate appellate review. *Id.* In *Elliott,* we dismissed the appeals of a defendant who claimed immunity because he was not involved in the events in question and of other defendants who claimed that the plaintiff's allegations

were false. *Id.* at 342–43. We concluded that these appeals raised no issue relating to the uncertainty of the law at the time of the alleged unlawful conduct. *Id.* In *Hansen v. Bennett,* 948 F.2d 397, 400 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992), this court applied *Elliott* to hold that no jurisdiction existed over an appeal from a denial of qualified immunity that presented solely the question of whether one of the defendants had acted with bad intent. Because the defendants did not claim that "their appeal turns on legal uncertainty" but on resolving the factual question of state of mind, no jurisdiction existed over the claim. *Id.; see also Gorman,* 977 F.2d at 354 (stating that in interlocutory qualified immunity appeals this court has no jurisdiction over highly factual "we didn't do it" arguments).

■ With these principles in mind, we now determine whether jurisdiction exists over any portion of the appeal of Messrs. Allen, Anderson, and Fusco. The defendants assert that no causal connection exists between any supposedly protected speech by Mr. Marshall and his discharge from the CHA because, for example, some of the statements at issue were too far removed in time from his discharge, or because there is no proof that the defendants knew of these statements. However, as the district court noted, "[f]actual disputes ... exist as to whether plaintiff was fired for this speech." Mem.Op. at 5. Having reviewed the record, we agree that substantial questions exist as to why Mr. Marshall lost his job. Defendants' causation argument does not touch upon whether they "acted in the shadow of legal uncertainty" when they fired Mr. Marshall. *Elliott,* 937 F.2d at 342. Instead, their argument asks us to determine that Mr. Marshall's actions and speech did not contribute to the decision to discharge him. Under *Elliott* and *Hansen,* resolution of this factual issue is not within the scope of an appeal from the denial of qualified immunity. Thus, we have no jurisdiction over this aspect of defendants' appeal.

■ With respect to Count II, the defendants also assert that they are entitled to qualified immunity because it was not clearly established that any of the actions relied upon by Mr. Marshall are protected by the First Amendment. Unlike the defendants' causation argument, this contention requires us to consider the state of the law at the time that Mr. Marshall , was discharged; that is, we are asked to determine whether in June 1988 it was clearly established that Mr. Marshall's statements and actions enjoyed First Amendment protection. As directed by *Mitchell v. Forsyth,* 472 U.S. at 528–29, 105 S.Ct. at 2816–17, we have jurisdiction to decide this issue.[3]

### B. *The First Amendment Issues*

■ Whether a right was sufficiently clearly established to preclude a defense of qualified immunity is a question of law. *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816; *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). This court reviews de novo a district court's summary judgment determination on qualified immunity. *See Upton v.*

*Thompson,* 930 F.2d 1209, 1211 (7th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). "At the summary judgment stage, the defendants cannot prevail if [the plaintiff] can present a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity." *Hall,* 957 F.2d at 404. , We interpret the facts in the light most favorable to Mr. Marshall, the nonmoving party, when they are supported by the evidence. *See id.*

■ In *Siegert,* the Supreme Court clarified the process for determining when a public official is entitled to qualified immunity. — U.S. at —, 111 S.Ct. at 1793. Under the *Harlow* qualified immunity analysis as explicated in *Siegert,* the first inquiry is a threshold issue that can defeat entirely a claim of qualified immunity. If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of constitutional rights, then the plaintiff's claim fails. *Id.* Courts are not required to ' examine the clearly established law at the time of the offense if the plaintiff's allegations do not assert a violation of constitutional rights. *Id.;*[4] *see Maldonado v. Jo-*

3. The district court also held that there was no basis upon which it could sustain a claim of qualified immunity with respect to Count I (Title VII and Equal Pay Act claims). The plaintiff-appellee now asks that we dismiss these claims insofar as they seek relief from the individual defendants-appellants. The defendants-appellants, while claiming that they "do not and did not object to the dismissal with prejudice of any of the claims in this suit," prevent dismissal by their insistence that the dismissal be conditioned on the appellee's payment of costs and attorneys' fees for "prosecuting, unnecessarily, the Count I claims on this qualified immunity appeal." Defendants' Response to Plaintiff's Motion for Voluntary Dismissal at 1–2. Dismissals in the Court of Appeals are governed by Federal Rule of Appellate Procedure 42(b). Under that provision, we cannot dismiss Count I on the motion of the appellee absent agreement among the parties on the matter of costs.

Upon examination of the allegations of Count I and the record before us, it becomes readily apparent that the defendants-appellants have expended little effort, either in the district court or in this court in delineating their position for qualified immunity on the Title VII and Equal Pay Act claims. We caution that it is not our obligation, nor was it the district court's, to provide the necessary reasoned elaboration. *Cf.*

*Beard v. Whitley County REMC,* 840 F.2d 405, 408–09 (7th Cir.1988) (noting the obligation of the parties under Federal Rule of Appellate Procedure 28(j) to present issues and supporting authority). Nevertheless, we have attempted, on the basis of the record and briefs, to examine the merits of the defendants-appellants' claim.

We must conclude that, while the defendants-appellants couch their arguments in terms of qualified immunity, those arguments go, in large measure, toward the merits of Mr. Marshall's claim and therefore are beyond our limited jurisdiction on this appeal. To the extent that it can be said that the defendants-appellants do raise a legal contention that the allegations of the complaint do not state any basis for a claim against them, *see Seigert v. Gilley,* — U.S. —, —, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991), we must, on the record before us, reject the contention.

4. In *Siegert,* the plaintiff alleged that his former supervisor had written a defamatory letter in regard to plaintiff's job performance, thereby violating plaintiff's Fourteenth Amendment liberty interest without due process. — U.S. at —, 111 S.Ct. at 1792. The Supreme Court stated that Siegert had failed to overcome his supervisor's qualified immunity claim because,

*sey,* 975 F.2d 727, 729 (10th Cir.1992), *petition for cert. filed,* ——— U.S. ———, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1992); *Quintero de Quintero v. Aponte–Roque,* 974 F.2d 226, 228 (1st Cir.1992); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1368 (3d Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 1045, 122 L.Ed.2d 354 (U.S.1993); *Get Away Club, Inc. v. Coleman,* 969 F.2d 664 (8th Cir.1992); *see also Elliott,* 937 F.2d at 341–42 (noting that courts must ask whether particular conduct violates protected rights). Despite Messrs. Allen, Anderson, and Fusco's claims to the contrary, Mr. Marshall has alleged a constitutional violation. Mr. Marshall asserts that his discharge from employment following his verbal and nonverbal support of the *Cary* plaintiffs violated his First Amendment rights to freedom of speech and association. We do not scrutinize the merits of Mr. Marshall's claim; however, based on defendants' conduct as alleged by Mr. Marshall and reasonably supported by the record, a constitutional violation has been alleged adequately. A government employee cannot be fired for the nondisruptive exercise of his First Amendment right to express himself on a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, if Mr. Marshall's allegations are true, defendants would have violated his constitutional rights when they discharged him.

■ Moving to the second prong of the *Harlow* qualified immunity analysis, the defendants argue that they are entitled to immunity because, at the time of Mr. Marshall's discharge, the law was not so clearly established that defendants could have known that his actions enjoyed First Amendment protection. In order for a right to be "clearly established" for purposes of a qualified immunity analysis, the Supreme Court has stated that the right must be established in a "particularized" sense; that is,

even accepting his contentions as true, he had asserted no constitutional violation because an injury to reputation alone is not a constitutional

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *accord Warlick,* 969 F.2d at 309; *Upton,* 930 F.2d at 1212. The level of generality at which the relevant legal right is identified "cannot be so abstract as to convert the rule of qualified immunity into a rule of virtually unqualified liability." *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992). However, it is equally true that there need not be "a prior case that is 'precisely on all fours on the facts and law involved here.'" *Id.* (quoting *Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 676 (7th Cir.1990)). Instead, the test for immunity should be "'whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Rakovich,* 850 F.2d at 1209 (quoting *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987)).

1. Freedom of speech

■ When discharged because of his speech, a public employee has no First Amendment claim unless he was speaking on a matter of public concern. *Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90; *Griffin,* 929 F.2d at 1212. The defendants in this case base their claim of qualified immunity on an assertion that it was uncertain whether what Mr. Marshall said and did in support of the *Cary* plaintiffs touched upon a matter of public concern. In *Connick,* the Supreme Court announced the applicable standard for determining whether an employee's speech relates to a matter of public concern: "[w]hether an employee's speech addresses a matter of public concern must be determined by the

violation. *Id.* at ———, 111 S.Ct. at 1794. Thus, the defendant was able to claim successfully qualified immunity.

content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690; *see also Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987) (stating same). However, the Court also noted that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *see also Marquez v. Turnock*, 967 F.2d 1175, 1177–78 (7th Cir.1992). Opinions of this court subsequent to *Connick* have directed that, when determining whether speech touches upon a matter of public concern, we are not to examine solely the content of that speech. "[T]he *Connick* 'test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987) (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985) (emphasis in original).[5]

█ We believe that it was clearly established in June 1988 that Mr. Marshall's alleged speech and conduct dealt with a matter of public concern. We therefore agree with the district court that the defendants were not entitled to summary judgment on their claim of qualified immunity on the freedom of speech issue. *See Hall*, 957 F.2d at 404 (noting that defendants cannot prevail at the summary judgment stage if plaintiff can present a version of

the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity). Mr. Marshall alleges that he engaged in numerous actions aimed at supporting the *Cary* plaintiffs in their dispute with the CHA. These include making a pre-litigation statement to the CHA's General Counsel suggesting that the plaintiffs deserved a forum to air their grievances, sharing information with the *Cary* plaintiffs relating to their lawsuit, defending the professional competence of several of the plaintiffs in a conversation with Mr. Fusco, and associating with the *Cary* plaintiffs and making statements in support of them in the hostile atmosphere that allegedly existed in the CHA's Legal Department after the issuance of the "Chinese Wall" memo.

It cannot be disputed that in June 1988 the law was clearly established that the subject of this speech—sex discrimination in a public agency—was a topic of public interest. Prior to that time, this court had decided *Yatvin v. Madison Metropolitan Sch. Dist.*, 840 F.2d 412, 419 (7th Cir.1988), which dealt with a claim of retaliation for filing a charge of sex discrimination. In *Yatvin*, the panel noted that "[s]ex discrimination is a matter of public concern, obviously debate over it is protected by the First Amendment." *Id.* Similarly, *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987), stated that it was "undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern." *See also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8 (describing as involving "a matter inherently of public concern" the speech at issue in *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), where an employee protested racial discrimination privately to her employer). Reinforcing our conclusion

---

5. *But see Auriemma*, 910 F.2d at 1460 (Personal motive in filing law suit relating to alleged discrimination in police department did not prevent the suit from being a matter of public concern. "Even if the plaintiffs themselves viewed their problems as only a personal matter, the test of public concern is more objective. It does not depend entirely on the fact the

plaintiffs filed a suit for damages and would benefit but also on the other factors discussed in *Connick*."); *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir.1988) (employee's motive in speaking, although relevant to whether speech relates to a matter of public concern, is not dispositive).

that the alleged gender discrimination at issue was of public concern is the fact that both the allegations and the subsequent terminations had received coverage in the Chicago newspapers and had been the subject of a press conference held by several women's interest organizations prior to Mr. Marshall's firing. *See Auriemma,* 910 F.2d at 1460 (noting that newspaper story was some evidence of public interest and concern).

Likewise, we believe that the form and context of Mr. Marshall's alleged speech clearly established its public character. Although the speech appears primarily to have occurred in the office, this fact does not prevent it from relating to a matter of public concern. Prior to June 1988, the Supreme Court had decided *Givhan* and *Connick* in which statements made in a work environment were found to relate to matters of public concern.[6] In addition, some of Mr. Marshall's speech was directed in part at General Counsel Thomas and Mr. Fusco, who were involved in the *Cary* plaintiffs' grievances and would have been persons to whom speech regarding the case would have been most forcefully directed.

██ Unlike the speech at issue in *Yatvin* and *Altman v. Hurst,* 734 F.2d 1240 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984), on which the defendants principally rely, Mr. Marshall's speech, as it is portrayed at this stage of the litigation, appears not to have arisen from a private dispute between himself and the CHA. *See Callaway,* 832 F.2d at 417 (instructing that when evaluating whether speech touches upon a matter of public concern a court is to examine the point of the speech). No one in this case contends that Mr. Marshall was himself a victim of gender discrimination or that he had any personal stake in the outcome of

the *Cary* plaintiffs' contentions. There is no allegation that Mr. Marshall's speech was tied to a personal interest; it was presumably *against* Mr. Marshall's interests to speak on behalf of the *Cary* plaintiffs. Indeed, Mr. Marshall claims that speech on this issue caused his discharge. Instead, the record upholds an inference that this speech was part of an attempt to support the *Cary* plaintiffs and to protest discrimination in the CHA's Legal Department. According to the allegations before us, Mr. Marshall was not engaged in a mundane employment dispute, but was instead protesting the illegitimate policies of a government agency. Cases decided by this court and the Supreme Court before Mr. Marshall's discharge clearly establish that speech of this type, which protests conditions in a public agency and does not solely promote the plaintiff's own interests, addresses a matter of public concern and enjoys First Amendment protection. *See Connick,* 461 U.S. at 149, 103 S.Ct. at 1691 (question on employee/attorney's questionnaire to coworkers discussing pressure to work in political campaigns on behalf of office supported candidates touched upon a matter of public concern); *Knapp v. Whitaker,* 757 F.2d 827, 840–42 (7th Cir.) (teacher's speech protesting mileage reimbursement, insurance, and grievance procedure policies that also affected others touched upon matters of public concern), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *see also Giacalone v. Abrams,* 850 F.2d 79, 86 (2d Cir.1988) (statements of a lawyer in a state agency that the litigation strategy formulated by department officials was legally unauthorized and ethically improper "did touch on matters of colorably public concern, and ... this dimension of his speech would have been apparent to reasonably informed superiors in December 1982").[7] While we intimate no opinion as

---

**6.** *See Connick,* 461 U.S. at 146, 103 S.Ct. at 1689 (stating that "First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly"); *Givhan,* 439 U.S. at 415–16, 99 S.Ct. at 696–97 (same); *see also Colburn v. Trustees of Ind. Univ.,* 973 F.2d 581, 588 (7th Cir.1992) (citing *Givhan* and stating that an employee's statements made privately to others in the workplace may be pro-

tected under the First Amendment if they address some public concern); *Marquez,* 967 F.2d at 1178 (noting that it was immaterial that plaintiff made statements "within the Department rather than to the general public").

**7.** In their brief, the defendants raise an argument that under Illinois law the CHA could have discharged Mr. Marshall from his attorney's position at any time. However, we are

to the merits of Mr. Marshall's freedom of speech claim, the defendants are not entitled to qualified immunity on this issue.[8]

### 2. Freedom of association

Mr. Marshall included within his First Amendment count a claim that the defendants' conduct violated his constitutional right to freedom of association. In their motion for summary judgment, the defendants sought qualified immunity on Mr. Marshall's First Amendment count, claiming that "[t]he law was not clearly established at any time prior to June 20, 1988 that any of the acts the individual defendants are alleged to have taken were violative of the constitutional or federal statutory claims raised by plaintiff." Defendants' Mem. in Support of Their Motion for Summary Judgment at 32. However, the defendants did not raise a legal argument that the law regarding Mr. Marshall's freedom of association claim was not clearly established in June 1988. Instead, they confined themselves to arguing the uncertain state of the law relating to his free speech claim. The district court concluded that the failure of the defendants to raise any legal argument regarding freedom of association prevented granting qualified immunity to the defendants on that claim. The defendants argue that this finding of waiver was improper because the district

court impermissibly shifted the burden of proof on the qualified immunity issue from Mr. Marshall to themselves.

We hesitate to rest our decision on the ground relied upon by the district court. In this circuit, once a defendant claims qualified immunity, the burden is on the plaintiff to show that the right claimed to have been violated was clearly established. *Pounds v. Griepenstroh*, 970 F.2d 338, 342 (7th Cir.1992), *petition for cert. filed*, —— U.S. ——, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1992); *Fernandez v. Perez*, 937 F.2d 368, 370 (7th Cir.1991); *Rakovich*, 850 F.2d at 1209. In this case, the defendants raised a qualified immunity defense with regard to the entirety of Mr. Marshall's First Amendment claim; this necessarily included the freedom of association facet. *See Williams v. City of Albany*, 936 F.2d 1256, 1259 (11th Cir.1991) (noting that defendants' averments of good faith and immunity in their responsive pleadings were "minimally sufficient" to fulfill the duty of asserting the issue of qualified immunity). At that point in the litigation, the burden was on Mr. Marshall, not the defendants, to establish whether the law on this issue was clearly established. The failure of the defendants to make a supporting argument regarding the state of the law on freedom of association should not result in

uncertain of the relevance of this assertion in the circumstances in which we review this case. The only one of the defendant's claims that is properly before this court is whether they were entitled to qualified immunity because it was not clearly established that Mr. Marshall's speech enjoyed First Amendment protection. To the extent that the defendants argue that Mr. Marshall's employment as a lawyer made it uncertain whether his speech enjoyed the protection under the First Amendment, this argument is rendered meritless by the Supreme Court's 1983 decision in *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691, which concluded that a portion of an attorney's in-office speech touched upon a matter of public concern and was within the scope of the First Amendment.

8. Before we leave the freedom of speech claim, we must note that, even if a public employee's speech touches upon a matter of public concern, the employer may constitutionally discharge the employee for that speech if the government's

interest in the "effective and efficient fulfillment of its responsibilities to the public" outweigh the employee's interest in speaking. *See Connick*, 461 U.S. at 150–51, 103 S.Ct. at 1692; *see also Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (stating that a court must balance the interests of a public employee in commenting upon matters of public concern with the state's interest "in promoting the efficiency of the public services it performs through its employees"). However, with respect to the qualified immunity claim, the defendants have neither argued nor presented any evidence that Mr. Marshall's conduct disrupted the CHA workplace. The defendants, therefore, do not invoke this balancing of interests to argue that Mr. Marshall's discharge did not violate his First Amendment rights. Indeed, the defendants' primary defense on the merits of this case appears to be that Mr. Marshall's speech had nothing to do with his dismissal. In light of this, defendants have waived a *Pickering* analysis.

waiver of the defendants' claim to qualified immunity on that issue.

Because the defendants' defense was not waived, we must now determine whether Messrs. Allen, Anderson, and Fusco were indeed entitled to qualified immunity on the freedom of association claim. Although the circuits are split on this issue, in this circuit, a public employee is protected from dismissal based upon his exercise of the freedom of association only when his associational conduct relates to a matter of public concern. *Griffin v. Thomas*, 929 F.2d 1210, 1214 (7th Cir.1991).[9] In *Griffin*, we noted that the Supreme Court has refused to institute a hierarchy of the rights protected under the First Amendment. *Id.* at 1213–14 (citing *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985)). We further noted that, in crafting the public concern requirement in *Connick*, the Supreme Court relied on *Pickering*, which itself was "rooted in cases dealing with speech and associational rights." *Griffin*, 929 F.2d at 1213. Thus, in applying *Connick* and its public concern requirement to freedom of association claims raised by public employees, this court found no reason to differentiate among the various rights protected under the First Amendment. *Id.* at 1214. Therefore, Mr. Marshall's associational activities in furtherance of his protest against the alleged discriminatory policies of the CHA Legal Department did relate to matters of public concern as delineated in the freedom of speech section of this opinion.[10]

Mr. Marshall asserts that the defendants are not entitled to qualified immunity on his freedom of association claim. In his brief, Mr. Marshall contends that, during the time period at issue, he intentionally associated with the *Cary* plaintiffs for the purpose of collective expression aimed at protesting their treatment and at eradicating systemic discriminatory and retaliatory policies in the CHA Legal Department. He then argues that the defendants were not entitled to qualified immunity on this count because

> [c]ollective activity undertaken to obtain meaningful access to the courts has long been recognized as a fundamental right within the protection of the First Amendment.... Thus, clearly established law protected Marshall from retaliation due to his associations with the [*Cary*] plaintiffs because those associations were for the purpose of engaging in activities protected by the First Amendment—speech, assembly, and petition for redress of grievances.

Appellee's Br. at 32 (citations omitted). In support of this contention, Mr. Marshall cites two Supreme Court cases dealing with the freedom of association, *United Transp. Union v. State Bar of Michigan*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971), and *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Resolving this issue requires us to determine whether the contours of the associational right that Mr. Marshall asserts were sufficiently clear that reasonable officials would understand that their termination of his employment allegedly on the basis of his purposeful association with the *Cary* plaintiffs violated that right. *See Warlick*, 969 F.2d at 309. As we have discussed at great length earlier, we are mindful that this right must be "clearly

---

**9.** *Accord Boals v. Gray*, 775 F.2d 686 (6th Cir. 1985); *But cf. Hatcher v. Board of Pub. Educ. & Orphanage*, 809 F.2d 1546 (11th Cir.1987) (holding that the public concern requirement of *Connick* is inapplicable to freedom of association claims).

**10.** In our qualified immunity analysis, it is unnecessary for us to decide whether defendants should have known in June 1988 that Mr. Marshall's associational conduct was protected under the First Amendment only to the extent that it related to matters of public concern. If this limitation was not yet clear in 1988, defendants would have violated Mr. Marshall's First Amendment rights by firing him for any conduct (not merely conduct that dealt with matters of public concern) he engaged in pursuant to his First Amendment free association right. Thus, although we believe that Mr. Marshall's associational conduct did relate to a matter of public concern—gender discrimination in a public agency—it is unnecessary for us to engage in a lengthy discussion of this issue because the standard was actually stricter without the public concern requirement established in this circuit in 1991 in the face of a circuit split on this issue. *See Griffin*, 929 F.2d at 1213.

established" in a "particularized" sense. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

■ The constitutionally protected right to freedom of association consists of two categories: (1) the freedom to maintain certain intimate human relations, such as marriage, procreation, education of one's children, and cohabitation with one's relatives and (2) the right to associate to engage in activities protected by the First Amendment, such as speech, assembly, petition for redress of grievances, and exercise of religion. *Roberts,* 468 U.S. at 617–18, 104 S.Ct. at 3249–50. Mr. Marshall's claim of the defendants' violation of his freedom of association involves his right to associate conspicuously with others for the purpose of protesting allegedly discriminatory practices. He claims that he intentionally continued to associate with the *Cary* plaintiffs in a manner designed to demonstrate to the other Department employees that he opposed the allegedly discriminatory practices perpetuated by the defendants. This claim does not implicate the first category of freedom of association as delineated in *Roberts.* Mr. Marshall's claim falls squarely into the second category, however, because he alleges that defendants' actions were taken in response to and in punishment of Mr. Marshall's verbal and nonverbal support of the *Cary* plaintiffs and their grievances.

This freedom of association is not expressly set out in the Bill of Rights, but was held by the Supreme Court to be an implicit part of the freedoms of speech, assembly, and petition. *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). *See also Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972) (stating that the freedom of association has long been held to be implicit in the other listed freedoms in the First Amendment and listing cases so holding). In *NAACP v. Alabama,* the Supreme Court noted that the freedom of association is necessary for the advancement of other First Amendment freedoms. 357 U.S. at 460, 78 S.Ct. at 1171. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by

group association...." *Id.* The First Amendment protects the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987). "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Roberts,* 468 U.S. at 622, 104 S.Ct. at 3252. Thus, the freedom to associate in order to promote and advance common beliefs and ideas is a constitutionally protected activity. *Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976). Moreover, state action that effectively chills the freedom to associate is subject to "the closest scrutiny." *NAACP v. Alabama,* 357 U.S. at 460–61, 78 S.Ct. at 1171.

We believe that the law regarding freedom of association was sufficiently clear at the time of Mr. Marshall's termination, so that the defendants should have known or could have known that their action was in violation of Mr. Marshall's constitutional rights. While most of the reported cases in this area revolve around an employee's right to associate in order to express political ideas through a union, an employee's desire not to associate with a certain organization, or an organization's attempt to exclude certain members of society from its group based upon an individual's immutable characteristics, Mr. Marshall's conduct falls within the range of protected association delineated in these cases. *See, e.g., Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (stating that state ban on political party endorsements for candidates in primary elections contravened freedom of association); *Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940 (finding that organization's policy of excluding women from active membership was not protected by the First Amendment); *Roberts,* 468 U.S. 609, 104 S.Ct. 3244 (compelling organization to accept women members did not violate male members' freedom of expressive association);

*Elrod,* 427 U.S. 347, 96 S.Ct. 2673 (finding that political patronage dismissals violate First Amendment); *Healy,* 408 U.S. 169, 92 S.Ct. 2338 (noting college students' First Amendment associational interests in furthering their political beliefs by establishing interest group on campus); *United Transp. Union,* 401 U.S. 576, 91 S.Ct. 1076 (holding that union had First Amendment right to engage in group activity to secure meaningful access to the courts). As noted above, the right to freedom of association protects an individual's ability to associate with others for the purpose of propagating and expressing ideas and beliefs, including political, social, economic, educational, religious, and cultural concerns. *See Rotary Club of Duarte,* 481 U.S. at 548, 107 S.Ct. at 1947. While there may have been debate in 1988 (and also at the present time) over whether the right to purely social associations with others are protected under the First Amendment,[11] there is no question that the right to associate in order to show support for and to promote political and social causes has long been protected by the First Amendment. While this court recently noted that casual chit-chat between two people is not protected under the First Amendment, at the same time we reaffirmed that expression of ideas with a purpose is protected. *Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990). "The purpose of the free-speech clause and of its judge-made corollary the right of association is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain." *Id.* at 1250–51 (citations omitted). Here, it is important that we remember that the associational right that Mr. Marshall posits is closely related to the speech right that he asserts and that we have already determined to have been stated in sufficiently

specific terms to preclude the application of qualified immunity. As this court has previously noted, "the right to associate 'is cut from the same cloth' " as the other rights contained in the First Amendment. *Griffin,* 929 F.2d at 1214 (quoting *McDonald,* 472 U.S. at 482, 105 S.Ct. at 2789). The same ideals of liberty and democracy inspired all the freedoms guaranteed to us in that Amendment. *McDonald,* 472 U.S. at 485, 105 S.Ct. at 2791. The Supreme Court has recognized that these freedoms, though not indistinguishable, are inseparable; they are "cognate rights." *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945).

Mr. Marshall clearly alleges that his association with the *Cary* plaintiffs was not merely social in nature. He intended to express certain ideas about gender discrimination and the behavior of a public agency in its relations with its female employees. Mr. Marshall alleges association designed to express his ideas, and this association is protected under the First Amendment. While we cannot and will not determine in this appeal whether Mr. Marshall's right to freedom of association was violated by the defendants' conduct, we can determine the status of the defendants' claim of qualified immunity. In June 1988, the law regarding freedom of association was sufficiently clear so that defendants could have ascertained that firing Mr. Marshall due to his association with the *Cary* plaintiffs was a violation of his constitutional rights.

## CONCLUSION

For the foregoing reasons we affirm the district court's decision denying qualified immunity for the defendants.

AFFIRMED.

---

**11.** In particular, we have in mind the sensitive and relatively contentious areas of dating and casual social chit-chat. *See Swank v. Smart,* 898 F.2d 1247 (7th Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *IDK, Inc. v. Clark County,* 836 F.2d 1185 (9th Cir. 1988); *Wilson v. Taylor,* 733 F.2d 1539 (11th

Cir.1984); *see also City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) (stating that the Constitution does not recognize a "generalized right of 'social association' that includes chance encounters in dance halls").