In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1658

TODD CIBULKA and SHELLY CIBULKA,

*Plaintiffs-Appellants*,

*v.*

CITY OF MADISON, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-537 — **James D. Peterson**, *Chief Judge*.

ARGUED FEBRUARY 24, 2021 — DECIDED MARCH 29, 2021

Before FLAUM, MANION, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Todd and Shelly Cibulka drove to the University of Wisconsin–Madison to visit their daughter Emily and enjoy festivities after a Badgers football game. But the good times took a bad turn. Todd and Shelly spent several post-game hours heavily drinking at a bar; upon locating them, Emily ultimately called the police; and Todd ended up in the county jail.

Todd and Shelly then sued the police officers for false arrest and excessive force. The district court granted summary judgment in favor of the officers on qualified immunity grounds. We agree that the officers are entitled to qualified immunity and therefore affirm the district court.

## I. BACKGROUND

On October 17, 2015, Todd and Shelly Cibulka drove from their home in Poynette, Wisconsin, to the University of Wisconsin–Madison, Todd's alma mater, where their eighteen-year-old daughter Emily was a freshman. It was homecoming weekend. The plan was to attend the Badgers football game, meet up with Emily afterwards, and then drive back to Poynette with her. Todd and Shelly parked their truck on a parking ramp near the state capitol and walked over to Camp Randall Stadium for the 11:00 a.m. game against Purdue.

At about 2:00 p.m., Todd and Shelly left the game and went to the Library Café & Bar for drinks with friends. They imbibed for the next several hours. Emily grew impatient because she wanted to leave Madison, but her parents weren't answering their phones. Emily and a friend eventually ventured out to find Todd and Shelly and arrived at the bar at around 7:00 p.m., just as her parents were leaving.

The four began walking toward the capitol building, and Todd and Shelly were clearly intoxicated—slurring their speech, dragging their feet, walking with a sway. Emily asked Todd for the keys to the truck, but he refused to hand them over. She asked him where exactly the truck was parked, but he refused to tell her. She called a cab, but her parents refused to get in. Todd was giggling. Emily was agitated.

Agitated enough, in fact, to call the Madison Police Department's non-emergency number twice for assistance. (The second call was prompted by Todd's wandering off and urinating between two houses.) Dispatch reported that Emily was "very upset"; that her parents were "drinking all day," "intox[icated]," "stumbling all over," "walking away," and "refusing to tell her where the truck [wa]s parked"; and that Emily was afraid "her father w[ould] become more upset/start acting out" or "fall into the street." Because the meandering party encroached on two jurisdictions, officers from both the University of Wisconsin–Madison Police Department ("UWPD") and the Madison Police Department ("MPD") were sent to conduct a welfare check.

When Todd and Shelly realized that Emily had called the police, they sat on a low retaining wall next to Johnson Street to wait. UWPD Officer Barrett Erwin and MPD Officer Hector Rivera pulled up at the same time; Rivera took the lead, and Erwin stayed to assist. Emily, anxious and in tears, told the officers that her parents had been drinking and stumbling, she didn't know where their truck was, her parents wouldn't get into a taxi, and her dad wouldn't give her the keys.

UWPD Officer Corey Johnson and another officer arrived and joined the conversation. Johnson understood that Emily was worried about her parents and was trying to figure out how to get them home safely. Johnson said he could give them a ride to their truck (wherever it was).

Meanwhile, Erwin went over to talk with Todd and Shelly, who were still sitting on the retaining wall, but he had a hard time communicating with them. Then Rivera gave it a try, with the goal of getting "everybody settled down and somewhere safe." Rivera asked where their truck was parked;

Todd vaguely pointed east. The couple was giggly and eva-sive and would not provide any substantive information other than that their truck was parked "[n]ear the capitol." They wouldn't answer any more questions and told Rivera that they were fine. To Rivera, the pair was obviously "drunk and belligerent."

Rivera returned to Emily and asked how she felt about driving her parents back to Poynette. Emily said she'd be okay with it so long as they sat in the back seat. Emily asked if the police could keep her parents from leaving and was told that they were adults who could leave if they wanted to.

Around this time, about ten minutes into the encounter, Todd stood up from the retaining wall and stepped or stag-gered forward, toward Johnson Street. Erwin, standing in front of Todd, thought Todd might tumble into the street, which was filled with post-game traffic. (Todd admits that he may have been unsteady on his feet but disputes that he al-most fell.) Erwin grabbed Todd by the chest, shoulders, and arm. He told Todd to sit down because he almost fell into the street. Todd said he was "good" and would not sit down. Er-win perceived Todd tighten up, clench his fists, and pull his hands in toward his chest with his elbows out.

Rivera heard the exchange and turned to see Erwin and Todd standing face to face. (Erwin is five-foot-eight and 160 pounds; Todd is six-foot-three and about 265 pounds.) Rivera and Johnson came over and joined Erwin in grabbing Todd. Erwin was calmly instructing, "Just take a seat, Todd." Todd replied, "No, I don't want to," "I'm not taking a seat, okay?" Todd tried pushing Erwin away with his elbows, and the of-ficers maintained their hold. They continued asking Todd to sit down and he continued to refuse and pull away. Emily

cried from the sidelines, "They're helping you, Dad." Shelly responded, "No, they're not helping him." Emily replied, "Yes, they are, Mom."

The officers decided to "decentralize" Todd, a technique used to bring resisting subjects to the ground to reduce the risk of harm. Johnson jumped up to get a better hold on Todd, and the group tumbled to the pavement in a pile. Todd tried to push himself up and yelled at the officers to get off him. The officers told him to stop resisting, held him down, and handcuffed him (using two handcuffs linked together owing to his size). Todd admitted in his deposition that he was actively resisting the officers[1] and has claimed that he was trying to break "free from the unlawful holds."

UWPD Sergeant Jeffrey Ellis arrived to find the scrum unfolding on the sidewalk. He was debriefed on the situation, including that Emily was an "absolute disaster."

Johnson and Erwin asked Todd if he needed medical attention: "Todd, the fight is over. Nobody wants to hurt you. You're okay. Where does it hurt? … Does your chest hurt? Do your arms hurt? Do your knees hurt?" Todd declined medical attention, and the officers declined Todd's request that the handcuffs be removed.

The officers stood Todd up and wanted to put him in a squad car so that spectators weren't staring and to generally stabilize the situation. They walked him over to the car and

---

[1] Todd maintains on appeal that he was only "passively" resisting the officers. We let his deposition transcript speak for itself. Q: "From the time that officers first put hands on you until the time that you were put in the van, is it fair to say that you actively resisted at various points throughout that interaction on October 17, 2015?" A: "Yes."

tried to persuade him to get in. Erwin told Todd that they just wanted to talk and didn't plan on taking him anywhere. Todd put most of his body in the car but would not get in all the way. Another officer, who is not a defendant, reached in the opposite door so that Erwin could hand him the seatbelt; the other officer then applied pressure to Todd's jaw or neck to get him in the car. Todd maintains that he was being choked and yelled, "Get his hands off my neck!" Erwin ordered Todd into the car and tried pushing him in, but he wouldn't budge.

Erwin did not want to hurt Todd by physically forcing him into the car, so he let him get out and Ellis took over. Ellis tried to reason with Todd for about fifteen minutes. Todd declared that he was not going to be forced into a police car and was standing up for his rights. It became evident that Todd was not going to cooperate, and he was placed under arrest for disorderly conduct and resisting an officer. He was eventually lifted into a police transport van and sent off to the county jail.

While not germane to this appeal, Todd's ordeal went into overtime. It ended only when he was released from jail at 2:30 the next morning, returned to his truck on the parking ramp, and smashed through the gate instead of paying the exit fare.

In July 2018, Todd and Shelly filed a complaint under 42 U.S.C. § 1983 against the City of Madison, the individual officers, and other defendants that have since been dismissed. Pertinent here, Todd and Shelly alleged that Rivera, Erwin, Johnson, and Ellis falsely arrested Todd and used excessive force against him in violation of the Fourth Amendment. In March 2020, the district court granted summary judgment in favor of the defendants on the basis that the officers are entitled to qualified immunity. Todd and Shelly appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment on qualified immunity grounds *de novo*. *Humphries v. Milwaukee County*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citing *Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012)). Qualified immunity shields government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent … placed the statutory or constitutional question beyond debate.'" *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (citations omitted) (first quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014); and then quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Todd and Shelly fail to overcome qualified immunity with respect to both their false-arrest and excessive-force claims. We'll tackle these claims in turn.

### A. False-Arrest Claim

The Cibulkas argue that Todd's arrest for disorderly conduct and resisting an officer was unlawful because there was no probable cause to believe he committed those offenses.

Of course, "[t]he existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest." *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). And an officer has probable cause when, "given the 'totality of the circumstances,' a reasonable officer would believe that the suspect had committed a crime." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (quoting *Jones v. City of Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013)).

Moreover, "a defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed.' Thus, as long as [the officers] reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest [Todd], then [they are] entitled to qualified immunity." *Fleming v. Livingston County*, 674 F.3d 874, 880 (7th Cir. 2012) (citations omitted) (quoting *Pierson v. Ray*, 386 U.S. 547, 555–58 (1967)). This is the "arguable probable cause" standard.

Here, it was eminently reasonable for the officers to believe there was probable cause to arrest Todd for disorderly conduct and for resisting an officer. Under Wisconsin law, a person is guilty of resisting an officer if he "knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority." Wis. Stat. § 946.41(1). And a person is guilty of disorderly conduct if he, "in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." *Id.* § 947.01(1).

Todd's conduct, which he admitted in his deposition amounted to active resistance (though which he now says was merely passive resistance), was sufficient for the officers to have reasonably believed that Todd was resisting the officers or engaging in disorderly conduct. The officers therefore had arguable probable cause to arrest Todd.[2]

The Cibulkas ask us to reject this conclusion because the police officers themselves created the disturbance and were not acting with lawful authority. That argument falls apart given our following discussion and need not be discussed independently.

We therefore agree with the district court that the officers are entitled to qualified immunity with respect to Todd's false-arrest claim.

*B. Excessive-Force Claim*

To overcome qualified immunity in an excessive-force case, the plaintiff must either (1) "identif[y] a 'closely analogous case that established a right to be free from the type of force the police officers used on him,'" or (2) show "that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Weinmann v. McClone*, 787

---

[2] Todd argues that whether there was probable cause is a question of fact for the jury. But whether arguable probable cause supports qualified immunity "is a pure question of law" to be decided by the court. *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012). At any rate, a court may decide the issue of probable cause where "there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir. 1997) (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994)).

F.3d 444, 450 (7th Cir. 2015) (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)).

The Cibulkas admit that they "are unable to cite … a case that clearly applies to the level of force exercised by the defendant officers … because none exist." Admissions of this sort are often fatal to plaintiffs' attempts to overcome qualified immunity. *See, e.g.*, *Liker v. Marino*, 78 F.3d 582 (5th Cir. 1996) ("The plaintiffs concede that they can point to no case establishing that a sheriff cannot [engage in the challenged conduct]. There being no clearly established right, the defendants are entitled to qualified immunity."); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994) ("As plaintiffs conceded at oral argument, no case clearly establishes that civilians have a duty to intervene. [The defendant] is thus entitled to qualified immunity.").

But the Cibulkas argue that the analysis should not end there for two main reasons. First, they contend that "a reasonable officer should not be able to assume his conduct is reasonable … unless there is case law affirmatively so stating." They cite no support for this argument, which is unsurprising because that's plainly not the law. "In this circuit, once a defendant claims qualified immunity, the burden is on the plaintiff to show that the right claimed to have been violated was clearly established." *Marshall v. Allen*, 984 F.2d 787, 797 (7th Cir. 1993) (citing, among other cases, *Pounds v. Griepenstroh*, 970 F.2d 338, 342 (7th Cir. 1992)). We will not flip this well-established burden on its head.

Second, the Cibulkas employ the expected last-ditch argument against qualified immunity and claim that the officers' constitutional violations were so obvious that the Cibulkas

don't need to cite a closely analogous case. But they misplay this argument, too, because they still need to identify "some settled authority that would have shown a reasonable officer in [these officers'] position that [their] alleged actions violated the Constitution." *Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *accord Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). In other words, they must show that "a general constitutional rule already identified in the decisional law … appl[ies] with obvious clarity to the specific conduct in question," *United States v. Lanier*, 520 U.S. 259, 271 (1997), so that "a reasonable person necessarily would have recognized it as a violation of the law," *Leiser*, 933 F.3d at 701 (quoting *Howell*, 853 F.3d at 897).

If anything is obvious about this case, however, it's that the officers' conduct did not obviously violate the Constitution. Let's take a look at the instant replay.

First, the officers grabbed Todd when he stood up from the retaining wall and moved toward Johnson Street. Todd disputes that he was going to fall into the street, but a reasonable officer could certainly have *thought* that Todd was in danger of toppling headlong into traffic and potentially harming himself (or disappointed Purdue fans driving back to Indiana). Erwin testified that he *did* think Todd was about to fall and grabbed him for that reason. The Cibulkas cite no "settled authority that would have shown a reasonable officer" that grabbing an inebriated individual for his own safety is a constitutional foul. *Id.* at 702. And it is not the least bit surprising that such cases do not exist. *See Winter v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001) (holding that police are not "required simply to walk away … thus permitting a possibly intoxicated

individual to … potentially harm[] himself and other citizens").

Next, the officers took down and handcuffed Todd after he admittedly began resisting and refused to sit down (and after, we repeat, arguable probable cause to arrest was formed). Again, we fail to see how this routine police activity is an obvious constitutional violation. Indeed, cases involving arguably more forceful conduct indicate otherwise. *E.g.*, *Dawson v. Brown*, 803 F.3d 829, 834 (7th Cir. 2015) (holding that an officer "could reasonably believe it was necessary to tackle" a 72-year-old man who was nonviolently interfering with his son's arrest); *Rooni v. Biser*, 742 F.3d 737, 739, 743 (7th Cir. 2014) (holding that an officer was entitled to qualified immunity where he "grabbed [the resisting plaintiff] by the back of the neck and jerked him back" while handcuffing him); *Findlay v. Lendermon*, 722 F.3d 895, 898–900 (7th Cir. 2013) (holding that an officer who tackled a nonviolent suspect was entitled to qualified immunity).

Finally, the officers huddled with Todd and tried to persuade him to get into a squad car to de-escalate the situation. When those efforts failed, they used incremental levels of force to get him into the car. And when those efforts failed too, they called a timeout and let Todd get out. Once again, the Cibulkas fail to convince us that this is one of those "rare cases … where the state official's alleged conduct is so egregious that it is an obvious violation of a constitutional right." *Leiser*, 933 F.3d at 702 (citing *Abbott*, 705 F.3d at 723–24); *see Brant v. Volkert*, 72 F. App'x 463, 466 (7th Cir. 2003) (nonprecedential) ("[T]he officers' tactics in placing [the plaintiff] in the police car may have been clumsy or imprudent, but they were not objectively unreasonable.").

In the end, "it should go without saying that this is not an 'obvious case' where 'a body of relevant case law' is not needed." *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Maybe the Cibulkas' case would be more persuasive if, say, the officers started gratuitously smashing Todd's ribs. *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs."). But they stopped well short of such unnecessary roughness.[3]

That's enough to decide the Cibulkas' excessive-force claim. We need not take up the parties' offer to consider the "community caretaker doctrine." *See Cady v. Dombrowski*, 413 U.S. 433 (1973). We note only that the pertinent cases from the Supreme Court and this court shed virtually no light on how that doctrine might apply to this case, and Wisconsin cases (which we may consider, *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014)) have applied it to justify the warrantless seizure of an individual in public, *see In re Kelsey C.R.*, 626 N.W.2d 777 (Wis. 2001).

If anything, these cases make it even more reasonable for an officer to believe that the conduct here was fair game and violated no clearly established rights. But ultimately, the community caretaker doctrine is beside the point. The only thing that matters is that the Cibulkas cite neither "'controlling authority' [n]or 'a robust consensus of cases of persuasive authority'" that establish the right to be free from the conduct in

---

[3] Todd makes repeated reference to being "choked." Accepting that disputed fact as true, as we must, it is nevertheless irrelevant, for the officer who Todd claims choked him is not a defendant in this case.

this case, *Wesby*, 138 S. Ct. at 589–90 (quoting *al–Kidd*, 563 U.S. at 741–42), and the officers' conduct was not "so egregious that it is an obvious violation of a constitutional right," *Leiser*, 933 F.3d at 702 (citing *Abbott*, 705 F.3d at 723–24).

Qualified immunity is therefore proper with respect to the Cibulkas' excessive-force claim.

### III. CONCLUSION

The officers are entitled to qualified immunity because at no point did they violate Todd Cibulka's clearly established rights. For that reason, we AFFIRM the district court's decision granting summary judgment in favor of the defendants.