133 F.3d 1036
 13 IER Cases 1135
 Kelvin BALTON and Tyrone Barnes, Plaintiffs-Appellants,
v.
CITY OF MILWAUKEE and Dennis Michalowski, individually and
in his official capacity as Deputy Chief of the
Milwaukee Fire Department, Defendants-Appellees.
 No. 97-1703.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 8, 1997.
Decided Jan. 15, 1998.
 
 Curry First, First, Blondis, Albrecht, Bangert & Novotnak, Peter Koneazny (argued), American Civil Liberty Union of Wisconsin, Milwaukee, WI, for Plaintiffs-Appellants.
 Melanie R. Swank (argued), Milwaukee City Attorney's Office, Milwaukee, WI, for Defendants-Appellees.
 Before CUDAHY, COFFEY, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 Kelvin Balton and Tyrone Barnes are firefighters, more precisely "assistant chief dispatchers," with the City of Milwaukee Fire Department. In this suit they contend that a performance evaluation rating them "below average" for "professional qualities," issued by the deputy chief of the fire department, Dennis Michalowski, violated their constitutional rights to freedom of association or, as more peculiar to this case, their freedom "not to associate."
 
 
 2
 Rank and file members of the fire department are represented by a union (Firefighters Local 215) that bargains with the City of Milwaukee over wages and conditions of employment. Members of the fire department above the rank and file level, the "command staff," are not unionized, but they have an organization, the Chief Officers Association, which looks after their interests. The Chiefs Association performs no collective bargaining tasks, but it benefits from contract provisions negotiated by Local 215. In that regard, the Association represents its members in "informal conversations" with Local 215 on contract issues.
 
 
 3
 In addition to Balton and Barnes, there are apparently two other firefighters in the city who hold the title of "assistant chief dispatchers." Until 1993 assistant chief dispatchers were not eligible for membership in the Chiefs Association. In 1993, however, assistant chief dispatchers were allowed to join the Association, and Barnes and Balton did so because they believed being members would assist them in obtaining pay grade increases and other benefits. Dues for Association members are $260 a year and, as far as we can determine, almost every fire department command level officer is a member of the Association.
 
 
 4
 Joining the Association did not turn out to be the pay raise and benefits elixir Balton and Barnes envisioned. They apparently learned, with Balton doing the research, that the Milwaukee Fire Department paid its assistant chief dispatchers as well as or more than the rate of pay received by those doing comparable work in other cities. So the Association was apparently not going to aggressively go to bat for Balton's and Barnes' interests as they saw them. This caused their zeal for the Association to wane, and both Barnes and Balton became delinquent in paying their dues.
 
 
 5
 In May of 1994 the Association treasurer reminded Balton and Barnes that their dues were in arrears. They did not pony up, so the treasurer mentioned the delinquencies to Michalowski, who tried to turn on the heat. A month later, in June, Michalowski and Balton's and Barnes' immediate supervisor, Anthony Stanford--the chief dispatcher--met to discuss the dues situation. Balton and Barnes did not indicate that they no longer wished to be members of the Association. A few weeks later, Balton and Barnes told Stanford that another meeting with Michalowski was unnecessary because they decided to pay their delinquent dues. Neither said they no longer wanted to be members of the Association, although Balton later claimed he didn't want to give Michalowski that news because it would rile him up and he might retaliate against them.
 
 
 6
 No dues were paid by either Balton or Barnes through September of 1994. Neither responded to a treasurer's notice to pay up, and Stanford subsequently reminded the pair of their responsibility to pay. During this time, both Balton and Barnes repeatedly indicated to Stanford that they would pay their dues. This assertion, we note, comes from the defendants' proposed findings of fact in support of their motion for summary judgment. Balton and Barnes responded to this assertion by saying they "disagree in part" with respect to the last sentence. However, neither Balton nor Barnes supported their disagreement with any explanation or citation to the record, and the district court held, and we agree, that this weak statement was insufficient to negate the proposed finding which the defendants properly supported with sworn affidavit evidence.
 
 
 7
 Balton and Barnes continued to assure Stanford that they would pay their dues, and although Barnes made a partial payment, they remained in arrears when Michalowski spoke to them again about the delinquencies. Eventually, near the end of September 1994, Balton told Stanford that he no longer wished to be a member of the Association. Whether or not Barnes took the same position is unclear, but it's a safe bet that he wasn't enthusiastic about maintaining his membership, so we can safely assume he did what Balton did. On or about September 28, 1994, Stanford told Michalowski that Balton (and we think Barnes) no longer wished to be members of the Association. Michalowski then wrote up a "form 131 performance evaluation" on Balton and Barnes.
 
 
 8
 The form 131 lists 10 "performance factors" to be ranked on a five-step scale ranging from "far below average" to "well above average." "Professional qualities" was one of the 10 factors,[1] and Michalowski marked the item "below average" on Balton's evaluation. Barnes also received a similarly marked "form 131." Michalowski sent the forms to August Erdmann,[2] the chief of the Milwaukee Fire Department, with a "justification" memorandum stating:
 
 
 9
 Balton [and Barnes] has refused to make dues payments to the Milwaukee Fire Department Chief Officers' Association. He has been talked to about this at least on 3 occasions.
 
 
 10
 Balton [and Barnes] told me that he would pay his dues. To date, he has not contacted the treasurer of the Association or made payments.
 
 
 11
 Balton [and Barnes] is only one of two department officers who fail to realize the importance of the Association to the officers and the Department.
 
 
 12
 Form 131's in general are not used by the Milwaukee Fire Department in determining promotion, pay increases, demotion, discipline, or discharge. But Balton and Barnes considered the assessments to be matters of "grave importance," and they saw them as "serious marks" on their careers and as direct threats to their job security. And so, although Balton and Barnes do not allege that they suffered any identifiable adverse consequences from the notations on the form 131's, they filed this suit claiming, curiously, a violation of their First Amendment rights "not to associate" with the Association.
 
 
 13
 The district court, on the defendants' motion for summary judgment, employed a Pickering/Connick "public concern" analysis in dismissing the suit, and Balton and Barnes attack that approach to their case on this appeal. Our short answer to the appeal is that even though we agree that a Pickering/Connick approach to disputes of this sort may be a bit flawed, we nevertheless think the case was properly given the boot.
 
 
 14
 It is helpful, at the outset, to keep the facts of Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), in mind. In Pickering the Supreme Court held impermissible under the First Amendment the dismissal of a high school teacher for sending a letter to a local newspaper in connection with a proposed school tax increase. The teacher's letter criticized the board of education for its allocation of school funds between athletics and education and its handling of bond issue proposals. The issues were the subject of public attention at the time, and the teacher was exercising his rights as a citizen; for that, said the Court, he could not be fired. Pickering, 391 U.S. at 571-74, 88 S.Ct. at 1736-38.
 
 
 15
 In Connick, plaintiff Myers, an assistant district attorney in New Orleans, was faced with an unwanted transfer to another department. She expressed to her supervisors her disagreement with the move and then distributed a questionnaire to co-workers soliciting their views on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressure to work in political campaigns. Myers was fired for distributing the questionnaire, which her supervisors considered an act of insubordination. The Supreme Court found that with the exception of the question about pressure to work in political campaigns, the questionnaire involved private, not public concerns--the focus of the questions was not to evaluate the performance of the office but instead "to gather ammunition for another round of controversy with her superiors." Connick, 461 U.S. at 148, 103 S.Ct. at 1691. Even though one statement involved a matter of public concern, Myers' termination, said the Court, was not a First Amendment violation. In performing a balancing test, the Court found any harm to public debate outweighed by the government's interest as an employer. The questionnaire interfered with working relationships and potentially undermined confidence in Myers' supervisors. As such, Myers' speech was, on balance, essentially a matter of private concern unprotected by the First Amendment.
 
 
 16
 A Pickering/Connick balancing test, so useful in resolving public employee free speech cases, is not easily transferable to freedom of association cases. That's because some associational choices-for instance, whom to marry--are purely private matters. As such, one would think they would usually come up short in a private versus public concern balancing test. See Boddie v. City of Columbus, 989 F.2d 745 (5th Cir.1993). So strict reliance on Pickering/Connick presents potential problems.
 
 
 17
 We note a split in the circuits on the question. See Hatcher v. Board of Pub. Educ. and Orphanage, 809 F.2d 1546, 1558 (11th Cir.1987) (Connick is not applicable to freedom of association claims); and Boals v. Gray, 775 F.2d 686, 692 (6th Cir.1985) (Connick analysis applicable to freedom of association cases). In a trio of cases, all, coincidentally, authored by our Judge Ripple, we applied a Pickering/Connick balancing test to associational claims. See Griffin v. Thomas, 929 F.2d 1210 (7th Cir.1991); Marshall v. Allen, 984 F.2d 787 (7th Cir.1993); and Gregorich v. Lund, 54 F.3d 410 (7th Cir.1995). We, therefore, are firmly in the camp of those circuits that employ Connick to associational claims. But because Connick's public concern test grew out of a speech case, it may not appropriately recognize the important distinction between speech and association. This may lead, it can be persuasively argued, to insufficient protection of the associational rights of public employees.[3] Should our approach then to this issue be reexamined? Perhaps. But we think we should wait for a better case than this one to consider a different course.
 
 
 18
 The facts of this case allow us to draw from the Pickering/Connick test but do not require us to blindly rely on it. We think it is beyond dispute that Balton's and Barnes' disillusionment with the Chiefs Association had nothing to do with its political, social, or religious goals--in short, with stands it took on matters of public concern. Their disillusionment had everything to do with the organization's shortfallings on issues of purely individual economic importance--their salaries and the fact that those salaries were not much of a concern to the Association. This was not a situation--to take an admittedly extreme case--in which they were forced to join or not join Planned Parenthood and thus do violence to their views on a highly controversial issue like abortion.
 
 
 19
 But beyond that, and it is here that the Pickering/Connick test fails us a bit, Balton and Barnes did not draw the ire of Michalowski because they associated (or chose not to associate) with the organization. They got on his wrong side when he concluded that they failed to live up to their obligations to an organization they were, a short time earlier, dying to join.[4] Michalowski concluded that they were unprofessional when they voluntarily joined the Chiefs Association and then stopped paying dues required of all members. It was the act of nonpayment of dues that got under Michalowski's skin, and we fail to see how his reaction, noted on the form 131, adds up to an infringement of Balton's or Barnes' associational (or nonassociational) rights.
 
 
 20
 Finally, even if the situation alleged here could somehow be construed as a violation of the First Amendment, it is impossible to imagine a scenario where Michalowski would not be shielded from liability by the doctrine of qualified immunity given the murkiness of the law. Also, liability on the City of Milwaukee would be impossible to find because it could not conceivably be said that the actions here were taken pursuant to an official policy or custom. See Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
 
 
 21
 For these reasons, we conclude that this suit was properly dismissed on summary judgment. The judgment of the district court, therefore, is
 
 
 22
 AFFIRMED.
 
 
 23
 CUDAHY, Circuit Judge, concurring in the judgment:
 
 
 24
 I concur that Balton and Barnes may not recover damages because Michalowski is shielded by qualified immunity; the rights he allegedly violated were not "clearly established." See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). I also concur that the City of Milwaukee is not liable because there is no sufficient showing that the alleged violation of the plaintiffs' rights occurred pursuant to an official policy or custom, or that Michalowski is a person with final policy making authority. See Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 735 (7th Cir.1994).
 
 
 25
 I do not, however, agree that the Pickering/Connick public concern test is firmly established in Seventh Circuit jurisprudence involving purely associational claims. The three opinions cited by the majority address situations that involved both speech and association. In Gregorich v. Lund, for example, the plaintiff alleged that he had been fired for engaging in union-organizing activity. See 54 F.3d 410, 411 (7th Cir.1995). That kind of activity involves speech and advocacy for the purpose of promoting membership in an association. See id. at 412. But the mere act of joining or not joining a union--or a union-like organization like the Chiefs Association--involves the exercise of purely associational rights.
 
 
 26
 Pickering and Connick do not supply a relevant test for purely associational claims because such cases generally do not involve interference with the work relationship. This sharply contrasts with speech cases, or the hybrid speech/ association cases cited by the majority. For example, in Marshall v. Allen, the plaintiff was an attorney who claimed he was fired for violating a directive not to discuss employment-related cases with colleagues who had filed gender discrimination claims against their employer. See 984 F.2d 787, 790, 794 (7th Cir.1993). Pickering and Connick essentially require a court to weigh this sort of disobedience of a work directive against the values protected by the First Amendment. The Pickering/Connick test serves to simplify this balancing process by eliminating liability where First Amendment concerns are weak (i.e., the speech in question is not of public concern). But in the typical pure association case, the fact of association or of non-association has no impact on the work relationship and no balancing is necessary. Thus there is no need for a "public concern" test to short-cut the balancing process. Because the pure associational activities of government employees generally do not interfere with work relationships, there seems no good reason to apply the Pickering/Connick analysis in this context.
 
 
 27
 Further, the Pickering/Connick test is cumbersome in the context of a pure association claim. Under Connick, whether an employee's speech touches on a matter of public concern is determined by an analysis of the "content, form, and context of a given statement." Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). This analysis is applied easily to the hybrid cases cited by the majority. In Griffin v. Thomas, for instance, an assistant principal alleged that her employer retaliated against her for filing a grievance through the Chicago Teachers Union. See 929 F.2d 1210, 1210 (7th Cir.1991). To determine whether the plaintiff's activity touched on a public concern, the court was able to review the substance of her grievance. See id. at 1215. But how does one neatly apply the "content, form, and context" analysis to a claim that Michalowski retaliated against Barnes and Balton because they refused to pay dues or wished to disassociate from the Chiefs Association?
 
 
 28
 A relevant Seventh Circuit precedent, it seems to me, is McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir.1968). That case protects the right under the First Amendment of a probationary teacher to join a union. McLaughlin was almost contemporaneous with Pickering and predates Connick, but I think its analysis, which ignores any question of public concern or, for that matter, of the teacher's motives for joining the union, would be followed today. Perhaps, in so doing, the court might establish some sort of limitation on pure association claims by government employees to guard against "every employment decision be[coming] a constitutional matter." Connick, 461 U.S. at 143, 103 S.Ct. at 1688. But, for reasons I have given, the public concern test is not the appropriate limitation.
 
 
 29
 Finally, the majority concludes that the First Amendment has not been implicated because Michalowski gave the "below average" rating because the non-payment of dues was unprofessional, not because Balton and Barnes wanted to leave the Chiefs Association. This might well be true, but it is not the sort of conclusion that can be reached on summary judgment--at least on the present record. And it seems to me largely irrelevant that Balton and Barnes may have had bread-and-butter motives for joining the Chiefs Association, rather than idealistic ones. This is the sort of speculation, spawned from considerations of "public concern," that misses the mark.
 
 
 30
 I agree with the majority that the present case may not be a good vehicle for exploring larger questions of First Amendment law. I would therefore, as indicated, resolve the matter before us on immunity grounds only.
 
 
 
 [1]
 The other nine categories were: (1) job knowledge, (2) judgment and decisions, (3) plan and organize work, (4) management of resources, (5) leadership, (6) adaptability to stress, (7) oral communications, (8) written communications, and (9) promotion potential
 
 
 [2]
 Erdmann retired from the Milwaukee Fire Department on June 8, 1996
 
 
 [3]
 See Paul Cerkvenik, Note, Who Your Friends Are Could Get You Fired! The Connick "Public Concern" Test Unjustifiably Restricts Public Employees' Associational Rights, 79 Minn. L.Rev. 425 (1994)
 
 
 [4]
 Balton's counsel told us at oral argument that Balton had in fact "spearheaded" the effort to get assistant chief dispatchers accepted into the Association