Charlotte KLUG, Plaintiff–Appellant,

v.

CHICAGO SCHOOL REFORM BOARD OF TRUSTEES, District No. 299 Trustees, a municipal corporation; Paul Vallas, individually and officially as Chief Executive Officer of the Chicago Public Schools; Lynn St. James, individually and officially as Chief Education Officer, et al., Defendants–Appellees.

No. 98–3602.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1999.

Decided Nov. 23, 1999.

Bonnie L. Beck–Fries, Mary D. Cahill (argued), Cahill & Associates, Hinsdale, IL, for plaintiff–appellant.

Kathleen M. Gibbons (argued), City of Chicago Board of Education, Marilyn F. Johnson, Chicago Reform Board of Trustees, Law Department, Chicago, IL, for defendants–appellees.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Unhappy with her transfer from a position as Dean of Students for incoming freshmen at Prosser Vocational High School to a position as a teacher at an elementary school, Charlotte Klug brought this case under 42 U.S.C. § 1983 and Illinois common law. The district court granted the defendants' motion to dismiss the complaint and Klug appeals.

■ On appeal, Klug contends that her First Amendment right to freedom of association with certain educators and a local school council member was violated. She also claims a protected liberty interest in her employment reputation and the right to remain in the position from which she was removed or to be given a similar position to the one from which she was removed. Finally she raises a pendent state law claim for defamation. We review *de novo* a decision on a motion to dismiss a complaint, and we accept as true, for purposes of the motion, all well–pleaded facts in the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Dehainaut v. Pena,* 32 F.3d 1066 (7th Cir.1994).

Klug is a teacher with a K–9 certificate—i.e., she is certified to teach kindergarten through 9th grade—and has taught in the Chicago Public Schools since 1964. She blames her present troubles on a number of persons and entities, including the Chicago Reform Board of Trustees, District No. 299; Paul Vallas, Chief Executive Officer of the Chicago Public Schools; various administrators with the Chicago Public Schools; Timothy Czarnecki, a community representative to the

Prosser Vocational High School Local School Council; Peter Ardito, a teacher at Prosser; and others who play a less prominent role in her story. The complaint has been amended twice, and after the second amended complaint was dismissed, leave to try a third time was denied.

This particular story begins in February 1994, when, at the request of Noreen Nagle, who became acting principal and ultimately the principal upon the retirement of the former principal, Klug was transferred to Prosser from the elementary school where she was teaching. Klug became the Dean of Students for incoming freshmen. Nagle had cleared with school officials the fact that Klug had a K–9 certificate. The certificate was considered appropriate for the high school position so long as Klug was dean for incoming 9th graders and did not teach any grade above the freshman year. Klug remained dean until September 21, 1995, and from time to time assumed additional duties, which did not involve duties with students other than ninth graders.

What Klug alleges is that during her time at Prosser she was harassed because of her association with Nagle and the assistant principal, Robert Cardenas, as well as Lynette Sherrod–Carr, the president of the Prosser Local School Committee. Examples of harassment are that she was "shouldered" aside at the school mailboxes twice by another employee; someone slashed her car tires; her name was excluded in a graduation ceremony pamphlet; an anonymous letter about her was sent to the Office of Reform, and "hurtful" anonymous notes were left on her desk. During a heated argument between Czarnecki and Sherrod–Carr, who was also a personal friend of Klug's, Czarnecki threatened to eliminate Klug's job. In short, Klug sees Czarnecki and others as the "Old Guard" trying to get rid of the new people who came to the school with Principal Nagle.

On September 20, 1995, Klug received a letter ordering her to report to the Board

of Education's Central Services Center the next day. She appeared and was told that she had been summoned pending the results of an internal investigation. She was not told what the investigation was about, and the bureaucratic form ordinarily used for transferring people was not provided to her, nor did she receive notice of specific charges against her. As it turns out, an internal investigation of the school was conducted from July 5, 1995, through October 3, 1995. Prosser was declared a school in educational crisis, a classification created under the Illinois School Code, 105 ILCS 5/34–8.3(f), which gives rise to extraordinary remedies—such as transfer of personnel. Nagle and Cardenas were removed from their positions. Klug was reassigned to an elementary school; her hourly rate of pay remained the same, but at Prosser she was considered to be working 9 hours per day, while in the elementary school it was 6 hours; thus the result was a net loss of pay.

Klug contends that certain statements made by various school officials were defamatory. One statement is found in the findings published following the investigation; it is that there were "[a]dministrative personnel not possessing the required certification to serve in an administrative capacity; top administrator not qualified because only holds an elementary school certificate." A press release issued at the time the findings were released said that there would be a reassignment of an administrator to a position for which she was certified. After the findings, articles appeared in two Chicago newspapers, the *Sun–Times* and the *Tribune*. In a *Sun–Times* article, defendant Vallas, the chief executive officer of the schools, was quoted as saying, "Klug, who holds a certificate for grades kindergarten to ninth grade, is not qualified for her high school position." Ardito (the teacher at Prosser) was quoted in a *Tribune* article: "They ran a very tight ship and browbeat people to exercise total control." A *Sun–Times* article featuring Czarnecki contains the

following statement, which is not directly attributed to him: "Part of that money was used by the ousted principal, Noreen Nagle, and the assistant principal, Robert Cardenas, to bring Charlotte Klug into the administration at $60,000 a year despite Klug's lack of required credentials."

In her First Amendment claim Klug contends that she has a protectable interest in associating with "her group" (Nagle, Cardenas, and Sherrod–Carr) for the purpose of promoting the educational improvement of a public high school. The claim is long on complaints about the horrid things which happened to her as a result of this association but shorter on notice of what the issues were which her group was promoting. She says she was assigned by Nagle to oversee internal accounts in order to end the financial irregularities of the "Old Guard" and Czarnecki. Those irregularities were that Czarnecki took charge of an internal account with an annual cash flow of $200,000. When teachers wanted to spend money they had to have Czarnecki's approval, which it is alleged violated the Board's rules for handling student funds. In addition, Czarnecki was said to have established a subaccount from which he awarded student scholarships, also in violation of Board rules. There also was a $65,000 deficit in the account for ordering textbooks, and proper records were not kept of the soda machine accounts. In addition, Klug alleges that her group wished to end the "lazy" practice of teachers not turning in lesson plans and other reports; they wished to end running private businesses out of the school (the nature of the businesses remains obscure); in the case of a police officer assigned to the school, to end his making a poker table using school equipment; and to end the granting to female physical education students credit for acting as assistants to police officers. The harassment she suffered was a result, she says, of her association with her group, which opposed the "Old Guard." To put it mildly, hers were not lofty educational goals nor, in the complaint at least, are they stated with noticeable diplomacy.

Nevertheless, Klug maintains that the retaliation she suffered at the hands of other teachers and school officials was in violation of her right to freedom of association—her association with Nagle, Cardenas, and Sherrod–Carr. The right to freedom of association—though not specifically mentioned in the Constitution—grows out of the freedom to speak, to worship, and to petition the government. Those rights could not be protected unless a "correlative freedom to engage in group effort toward those ends" is also guaranteed. *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In this circuit, a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern. *Griffin v. Thomas*, 929 F.2d 1210 (7th Cir.1991); *Marshall v. Allen*, 984 F.2d 787 (7th Cir. 1993); *Balton v. City of Milwaukee*, 133 F.3d 1036 (7th Cir.1998).

In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court set out a two-pronged balancing test to determine whether a public employee's First Amendment rights have been violated. First, it must be determined whether the speech (or association) is on a matter of public concern. If it is, then the court must balance the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the government, as the employer, in promoting the efficiency of the public services it provides. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), clarified that whether an employee's speech involves matters of public concern is determined by the content, form, and context of the statement, as shown by the record as a whole. The governmental entity has broader power to restrict speech

when it acts as employer than it does when it acts as a sovereign:

> The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). The governmental entity must act upon a reasonable belief as to what the facts are, but there are situations in which

> reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.

*Waters* at 678, 114 S.Ct. 1878.

As we repeatedly say, we accept as true the well-pleaded facts in a complaint in evaluating a motion to dismiss that complaint. In this complaint, we are struck by the lack of articulation regarding what the matters of public concern were and the abundance of facts which cast in doubt whether, in context, even the matters referred to were, in reality, matters of public concern, or were, in the words of the district judge, "office politics." What emerges from the complaint is that, in Klug's view at least, she, Nagle, Cardenas, and Sherrod–Carr did not like the "Old Guard" and the "Old Guard" did not like them. The school seemed to turn into a snake pit. In that context, the allegations regarding a failure to submit lesson plans or of rather mild financial irregularities, which even without being set in context would allow an innocent interpretation, grow in insignificance.

■ Only in the most abstract way would the matters be of public concern.

We have observed that the "public concern element is lacking as a matter of law if speech 'concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee....'" *Cliff v. Board of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403 (7th Cir.1994), quoting *Marshall v. Porter County Plan Comm'n*, 32 F.3d at 1219 (7th Cir.1994) (emphasis in *Marshall*). We need to evaluate whether the employee is speaking (or associating to promote an idea) more like a citizen or a disgruntled employee. *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581 (7th Cir.1992). In broad general terms, of course, educational improvement and fiscal responsibility in public schools clearly are matters of public concern. Our point is, however, that in the context of this complaint, the association seems much more devoted to petty office politics than to matters of public concern.

■ Even if we were to give Klug the benefit of the doubt on this point, we then get to the balancing of Klug's interest in associating with persons trying, for instance, to wrest control of the student funds from Czarnecki or to end "lazy" practices, with the interest of the Board in rescuing the school from what it perceived to be an educational crisis. It is here that we encounter another difficulty with Klug's claims. She frames her freedom of association claim in terms of her being harassed because of her association with the Nagle faction. She cites single incidents of harassment by a police officer assigned to the building, a teacher who is a "potential defendant," other teachers who are members of the "Old Guard" but who are not defendants, a citizen member of the local school committee. Often the perpetrator is not identified; or each individual has taken one action which, standing alone, would not necessarily be harassment—*e.g.*, leaving her name off a program could be negligence, not harassment. Furthermore, Klug does not allege that the harassers were "acting under color of state law," which is, of course, a re-

quirement for a suit under § 1983. As best we can determine, she is saying that the Board, which would be acting under color of state law, had notice of what was going on and did not do the right thing—which apparently would have been to get rid of the Old Guard. What we are balancing, then, is Klug's right to associate with her group against the Board's interest in maintaining control of the school, keeping in mind that only procedures "outside the range of what a reasonable manager would use may be condemned as unreasonable." *Waters* at 678, 114 S.Ct. 1878.

Factors we consider in performing the balancing are whether the speech (or the association) would create problems in maintaining discipline or harmony among co-workers; whether personal loyalty and confidence are necessary to the job; whether the association impeded the employee's ability to perform her daily responsibilities; the time, place, and manner of the events; the context in which the dispute arose; whether the matter was one on which debate was vital to decision making; and whether the employee should be regarded as a member of the general public. *Kokkinis v. Ivkovich*, 185 F.3d 840 (7th Cir.1999). Ordinarily, we are reluctant to perform the balancing on the basis of the pleadings, partly because the Federal Rules of Civil Procedure do not require that a complaint describe alleged wrongdoing with particularity. Rule 8(a). But if a plaintiff chooses to plead particulars, and those particulars "show he has no claim, then he is out of luck—he has pleaded himself out of court." *Thomas v. Farley*, 31 F.3d 557, 558–559 (7th Cir.1994); *Jefferson v. Ambroz*, 90 F.3d 1291 (7th Cir. 1996).

Clearly, at Prosser, based on the facts set out in the complaint, something had to give. We do not know with certainty from this complaint which faction should have been transferred out of the school. However, the complaint is replete with allegations of bickering, of actions which show that the school was in a dire condition. The allegations show a crisis at the school. Many teachers and other personnel were in open revolt. Klug and her group had lost control of the school.

Looking at the complaint, and the facts alleged as the Board could reasonably find them to be, we are forced to conclude that the interest of the Board and Vallas with saving the school far outweighs Klug's interest in aligning herself with Nagle, et al. to gain control over a $200,000 student fee account, which, if it was being misused, was being misused, in part, according to her own allegations, to provide student scholarships. This is one of those rare cases in which the balancing can be performed based on the facts in the complaint. Klug has pled herself out of court. The claim based on a violation of Klug's right to freedom of association was properly dismissed.

Klug also sets out a claim based on a deprivation of a liberty interest under the Fourteenth Amendment. To state a claim for deprivation of a liberty interest it is not enough to show stigma to one's reputation. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). One must show both a stigma and a failure to rehire. The "infliction of a stigma to reputation accompanied by a failure to rehire (or, *a fortiori*, by a discharge) states a claim for deprivation of liberty without due process within the meaning of the Fourteenth Amendment." *Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir.1976). This is true even if the failure to rehire, or the discharge, does not involve a job in which one has a property interest. *Colaizzi*.

Assuming that Klug was stigmatized by the comments made by some of the defendants, the fact is that she was not discharged. She was transferred to another job within the school system, a job as an elementary school teacher, which is the sort of position she held before she transferred to Prosser. She maintained her hourly wage. What she did not get was

**860**

the additional three hours of work per day which she had enjoyed at Prosser. Is this a loss which meets the second prong of the test?

■ We find no specific answer to that question in our cases. What is clear is that a person has no protected interest in a particular job assignment. In *Gustafson v. Jones*, 117 F.3d 1015 (7th Cir.1997), Milwaukee police officers were removed from Tactical Enforcement Unit (TEU) positions and placed on street duty. They raised several claims including a deprivation of their liberty interests. The court said that in the past it had found a possible violation of a liberty interest when an employee was fired for a "publicly announced reason that impugned his moral character," if he were demoted to a position "far beneath the one he had," quoting *Lawson v. Sheriff of Tippecanoe County, Ind.*, 725 F.2d 1136 (7th Cir.1984). In the *Lawson* case the court explained by example what "far beneath" means; it would be like the difference between having been an officer and being offered a job as a janitor. In *Gustafson*, the example given was the difference from being a TEU officer and being an office file clerk. The demotion in *Gustafson* to street officer was not considered "far beneath" the TEU officers' former position; the court was quite clear that the officers did not, and could not, say that getting street duty was a severe demotion.

Neither, surely, would Klug say that being transferred to an elementary school is "far beneath" her job as a dean of incoming freshmen at a high school. She is still an educator; she is earning what an elementary school teacher with her experience would earn; she has retained her hourly pay rate. What she has lost is what can best be termed overtime pay which she was earning at Prosser. As the Board points out, it would be folly for us to determine that a loss of overtime pay triggers an entitlement to a hearing. Klug was not deprived of the ability to obtain another position; she was, in fact, not dis-

missed. She was transferred to another position within the Chicago school system. She therefore does not have an actionable claim based on a deprivation of a liberty interest.

■ Finally, Klug contends that her pendent state law claim for defamation should not have been dismissed. We disagree. To recover for defamation, Klug must show that a publication was false, that the defendant either knew it to be false or, believing it to be true, lacked reasonable grounds for that belief. *Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292 (1975). It is doubtful whether the statements alleged here to be defamatory meet the requirements.

■ One statement—found in the findings of the investigation—states that "an administrator will be reassigned to a position for which she is certified" but does not name Klug. In addition, it is hard to see how the statement is false. Another statement is found in a *Chicago Tribune* article in which Ardito is quoted as saying "they ran a very tight ship and browbeat people to exercise total control." Klug is not named in the comment. Furthermore, Ardito is expressing an opinion. A third statement is found in the *Chicago Sun–Times* article and refers to Nagle and Cardenas bringing Klug into the administration at $60,000 a year despite her lack of required credentials. The statement is not directly attributed to anyone, although the article focuses on Czarnecki, and Klug concludes that he said it. For diverse reasons, these statements would be unlikely to meet the test for defamation on the part of any specific official. A final statement is found in the *Chicago Sun–Times*. It is a statement attributed to Vallas that "Klug, who holds a certificate for grades kindergarten to ninth grade, is not qualified for her high school position." The latter part of the statement may not be absolutely true as to Klug's duties with ninth graders. As defamation goes, however, it is pretty mild.

More importantly, however, even if a statement is defamatory, under Illinois law, the defendants would have immunity for their statements made within the scope of their authority. *Blair v. Walker,* 64 Ill.2d 1, 349 N.E.2d 385 (1976). Citing *Barr v. Matteo,* 360 U.S. 564, 574, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the court said that the reason for the privilege is so that "officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect to acts done in the course of those duties...." Immunity is not overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice.

The complaint was properly dismissed.

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I join my colleagues in affirming the dismissal of Klug's claims. With respect to the First and Fourteenth Amendment claims, however, I do so for reasons distinct from the grounds they have articulated.

My colleagues resort to the second prong of the *Pickering* balancing test to affirm the dismissal of Klug's First Amendment claim. *See Pickering v. Board of Education of Township High School Dist. 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Waters v. Churchill,* 511 U.S. 661, 674–75, 114 S.Ct. 1878, 1887–88, 128 L.Ed.2d 686 (1994). They read the complaint to suggest that Prosser was on the brink of chaos when Klug and her allies were removed, and that is probably a fair reading of the complaint. *Ante* at 859. I therefore have no difficulty with the proposition that the Board of Education had to intervene. *Id.* But to hold that the Board's interest in saving the school far outweighed Klug's First Amendment interest in expressive association with her allies (*see id.*) is a significant leap, when the only basis we have for making that judgment is the complaint itself. Reading the com-

plaint favorably to Klug, as we must, I am not confident that we can legitimately make that judgment so early in the litigation. The complaint, after all (and not surprisingly) attributes the malfeasance entirely to the "old guard"; Klug, Nagle, and the other reformers are portrayed as the innocent victims of the insurrection. I am uncomfortable suggesting that the government can, in effect, silence one of its employees by transferring her out of her job when it is not she (or her speech) but others who are causing disruption in the workplace. The facts, of course, might in the end justify the decision to remove Klug; but that is the point—we don't have any facts before us.

What does persuade me that it was appropriate to dismiss the First Amendment claim is the lack of an identified expressive component in Klug's association with the Nagle faction. As Judge Evans quite rightly points out, the complaint itself gives rise to the impression that the battle between the old guard and the new at Prosser was simply another variant, if a particularly virulent one, of office politics. *Ante* at 858; *see also* R. 33 at 2. What the First Amendment protects (insofar as is relevant here) is association for the purpose of expression (*see generally Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987); *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984)), and one reads the complaint in vain for clues as to what types of speech Klug and her allies at Prosser were pursuing. The lack of such detail in the complaint is not alone fatal (*see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168–69, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); *Scott v. City of Chicago,* 195 F.3d 950, 951–52 (7th Cir.1999)), but one would expect to see in the briefs some explanation as to why and how Klug's association with the Nagle faction enjoys First Amendment protection (*see Stransky v.*

*Cummins Engine Co.,* 51 F.3d 1329, 1335 (7th Cir.1995); *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir. 1999)). I inquired about this at argument, and Klug's attorney suggested that her day-to-day work was expressive of her educational philosophy. But if that is true, then any government employee would have a potential First Amendment claim when discharged, disciplined, or transferred based on asserted deficiencies in his job performance. For Klug's claim to be viable, she would have to be able to identify some concrete expressive purpose to her affiliation with Nagle and the others. This she has not done.

As for the Fourteenth Amendment liberty interest claim, I share my colleagues' concern that not every loss of overtime be deemed constitutional in magnitude, such that a pre-deprivation hearing is invariably mandated whenever an employee is denied overtime pay. *Ante* at 859–60. Again, my concern relates to the fact that this case never moved beyond the pleading stage. It is the Board of Education that slaps the "overtime" label on the pay that Klug lost when she was removed from her position at Prosser. That label suggests the absence of any legal, enforceable relationship between the position Klug held at Prosser and the nine hours a day for which she was paid in that position. The facts might bear the Board out on that claim, but then again they might not. Based on a record devoid of evidence, I find it a stretch to say that under *no* set of facts could Klug show a liberty interest in being assigned a longer work day with commensurately greater compensation. Judge Zagel reached the same conclusion when he initially denied the Board's motion to dismiss this claim. R. 19 at 2 & n. 1.

Like Judge Zagel, however, I interpret the Fourteenth Amendment claim to focus on something other than the loss of additional work hours. *See* R. 33 at 2. The thrust of the second amended complaint appears to be that Klug was effectively "discharged" from employment at Prosser

in such a way as to diminish her prospects of employment at other schools. *See* R. 28 at 18–19, ¶¶ 63, 68, 71. Her opening brief sounds a similar theme. *See* Klug Br. 14 n. 3, 15 n. 5. Indeed, in the section of her brief devoted to the liberty interest claim, the nine-hour work day is not even mentioned. *See* Klug Br. 14–16. Only in the reply brief is the length of the work day emphasized, an argument which comes too late. *E.g., Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG,* 165 F.3d 526, 531 (7th Cir.1998). The notion that Klug was effectively "discharged" from her employment as in *Colaizzi v. Walker,* 542 F.2d 969, 973–74 (7th Cir.1976), *cert. denied,* 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977), is, as my colleagues agree, not a viable one. *Ante* at 860. Klug's employer was the school board, which simply assigned her to posts elsewhere within the system. Thus, having failed to pursue the loss of additional hours, Klug was left with no viable liberty interest claim.