**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARBARA V. HUDSON,
　　　　　　*Plaintiff-Appellant,*

v.

JAMES CRAVEN; YVETTE JACKSON;
PATRICIA SERRANO; KATRINA
GOLDER; DAVID DUBACK,
　　　　　　*Defendants-Appellees.*

No. 03-35408

D.C. No.
CV-02-05070-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
December 7, 2004—Seattle, Washington

Filed April 6, 2005

Before: Michael Daly Hawkins, Sidney R. Thomas, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Donald B. Potter, Portland, Oregon, for the plaintiff-appellant.

Talis M. Abolins, Assistant Attorney General, Olympia, Washington, for the defendants-appellees.

**OPINION**

McKEOWN, Circuit Judge:

The World Trade Organization ("WTO") is the international organization charged with dealing with the rules of trade between nations. In late November 1999, top trade officials from WTO-member countries met in Seattle. The Seattle gathering gained national attention, not just for the policy debate on international trade issues but also because of the demonstrations and violence that occurred.

This civil rights case stems from a community college instructor's claim that the college retaliated against her after she attended WTO protests with some of her students. Her claim is a hybrid one—it involves both speech and associational rights under the First Amendment. We are presented with an issue of first impression, namely the appropriate test for benchmarking this hybrid right. We conclude that this case should be evaluated under the balancing test established in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and that under *Pickering*, the college's legitimate safety and pedagogical concerns outweighed the instructor's rights. We affirm the district court's grant of summary judgment in favor of the college.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1997, Clark College, a community college in Vancouver, Washington, hired Barbara Hudson as an adjunct instructor to teach Economics 101, Introduction to Economics. In the fall of 1999, a few of Hudson's students suggested that the class attend a public rally and march opposing the WTO. Hudson thought that her students' attendance at the rally organized by the AFL-CIO on behalf of the labor movement would be a good idea, and that the speakers would expose the students to points of view not widely disseminated in the mainstream media.

When Dr. James Craven, the lead tenured professor in Clark College's Economics Department, became aware of Hudson's plan to attend the rally with her students, he was "absolutely opposed" to it. The Internet and news accounts warned about the potential for violence during the demonstrations and the Seattle Police Department was undertaking preparations in anticipation of rioting. The event was cast as the "Battle for Seattle." Craven told Hudson that attending the rally would put the students in danger and threatened to have her "terminated" if she went ahead with her plan.

Although these concerns did not stop Craven from attending the WTO protests himself, he was worried about the "potential risk to students and potential liability for the college." Craven communicated to Hudson that the students who attended the rally would have access to their teacher for "schmoozing" and "networking" in a way that other students would not; that a teacher should not mix her professional responsibilities with her politics; and that there was only "marginal [educational] benefit" in attending the demonstration. Nonetheless, Craven said that it was "fine" if Hudson or the students attended the WTO rally independently, without any affiliation with Clark College.

Patti Serrano, head of the Business Division at the College, also was troubled that Hudson wanted to attend the WTO as part of a field trip. Serrano felt that Hudson was not "completely forthright" about her plans, and eventually learned that Hudson and the students planned to participate in a demonstration explicitly opposing the objectives of the WTO. Serrano recommended to Yvette Jackson, Vice-President of the College, that Hudson "not be permitted to attend the demonstrations with students in a manner that suggested association in any manner with [the] College."

Two days before the protests in question, Jackson wrote a letter to "Faculty Members" that voiced "grave concerns about any involvement by Clark College students and faculty" in the WTO rallies. Her "major concerns" were the safety of students and faculty, and she laid down the following guidelines for faculty:

- Your participation in this event, as well as the participation of any Clark College student is as *an individual*, and *not* as a representative of Clark College.

- The participation of students must be entirely voluntary.

- There cannot be any connection or participation in this event to any grade or activity in the class.

- Students must be made aware that they are participating in this activity as individuals, and not as students at Clark College.

- Students who do not participate in this activity cannot in any way be penalized in terms of grade or be required to do any extra activity to "make up" for their lack of involvement.

- You will be responsible for the safety [of] the students accompanying you, and are charged with making prudent decisions as to the safety of participation in certain activities.

(emphasis in original).

Hudson backed off from her idea of organizing a field trip under the auspices of the College, and she wrote to Jackson that she would "tell the students planning to go to Seattle that we are not an official Clark [College] field trip." She stressed that "[t]he students will not be carrying placards in the parade identifying them as Clark College students."

Although she disclaimed any official role for herself as the instructor of students who would be in attendance, Hudson emphasized the educational value of observing the protests and the "caliber of the organizations cosponsoring" the WTO literature that she distributed in class to her students. She told students attending the rally to "observe information" as "it might be on the test." Hudson claimed that no students were pressured to attend, and that her role was confined to finding transportation because private vehicles would be unable to reach downtown Seattle on the day of the rally. In the materials setting out trip details, she wrote:

> This will be the political Mardi Gras of the century in Washington state. (Of course, there are just a few more days in the century . . . )
>
> Take care of one another. Stick with your buddy and your group. Make lots of noise. Dress warmly. Slickers will be provided if necessary. Take along a peanut butter or other sturdy sandwich that will not spoil just in case no vendors are available when you are hungry. Smile, laugh, tell jokes, observe information (it might be on the test) . . . .

The prediction of rioting and mass demonstrations erupted into reality. On November 30, 1999, the mayor of Seattle declared a civil emergency and imposed a dusk-to-dawn curfew over a large portion of the city. That same day, Hudson took a bus with some of her students, her husband, and others from churches and unions. Their participation in the rally was without incident. Although Hudson attempted to circumvent the clear directive that she could not sponsor a field trip on behalf of the College, the trip was, in effect, a de facto class field trip. As structured, from Hudson's organization of the trip to her integration of the trip into the final examination, it was impossible to separate the trip from the College.

Shortly after the WTO protests, Craven recommended non-renewal of Hudson's contract. He wrote to Hudson that her "services in teaching Economics 101 [would] not be required for the winter," and that Dr. Wambalaba, the tenured faculty member who was on leave, indicated a desire to return to the college to teach Economics 101. Craven also advised her that he would be assuming responsibility for Economics 101 classes in order to establish course content and scope consistent with the College's needs.

Hudson then filed suit against Craven and four other administrators of Clark College (collectively "the College" or "Clark College"). She alleged a cause of action under 42

U.S.C. § 1983 for violations of the First Amendment and a state law theory of tortious interference with a business expectancy.

The district court granted the College's motion for summary judgment. The court found that under the *Pickering* test, the interests of Clark College outweighed those of Hudson in associating with her students at the rally. In the alternative, under the test in *Mt. Healthy City School District Board of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), the district court found that Hudson's contract with the College would have been discontinued anyway, and that the administrators enjoyed qualified immunity. The court also dismissed her state law claim.

## II. DISCUSSION

### A. THE *PICKERING* STANDARD AND HYBRID FIRST AMENDMENT CLAIMS

The essence of Hudson's claim is that Clark College retaliated against her because she exercised her First Amendment rights. In a prototypical retaliation scenario, to establish a prima facie case under the First Amendment, a public employee like Hudson "must show that (1) she engaged in protected speech; (2) the defendants took an adverse employment action against her; and (3) her speech was a substantial or motivating factor for the adverse employment action." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (internal quotations and citations omitted). Once that showing has been made, the burden shifts to the employer who must

> demonstrate either that, under the balancing test established by *Pickering*[,] the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy*[,] the

employer would have reached the same decision even in the absence of the employee's protected conduct.

*Id.* (internal alterations, quotations, and citations omitted).

Hudson's claim, however, is not prototypical. As the district court explained, her claim is "more one involving freedom of association than freedom of speech." Hudson does not claim that Clark College terminated her employment because of any statements she made to her students or to anyone else. She was free to express her views about the WTO, which her supervisor in fact shared, both inside and outside the classroom. She also was free to participate in the anti-WTO rally as an expression of her views. Nor does Hudson claim that the College curtailed her right to associate with other anti-WTO protesters unconnected to the College. Hudson concedes in her brief that "[i]t was fine with Craven if Hudson went or if individuals who happened to be students at the College went to the WTO rally; he just objected to them going together."

[1] The deprivation of First Amendment rights that Hudson asserts is thus very narrow—essentially, the right to associate with a small group of students during a specific time frame for the particular purpose of attending an anti-WTO rally. Yet, while Hudson's claim revolves around a right to associate with students, it is not purely associational. The very purpose of the rally was to speak out against the WTO, an exercise that implicates core speech rights. Even though associational aspects predominate, the speech rights are inextricable from the claim. Her claim is best characterized as a hybrid speech/association claim.[1]

---

[1]Hudson argues that Clark College's alleged infringement of her associational freedoms must be subject to the "closest scrutiny" and is "unjustified except upon a showing of a valid interest of a State." *See NAACP v. Alabama*, 357 U.S. 449, 460-61(1958). Her invocation of the highest standard of scrutiny sidesteps the critical fact that she is a public employee.

**[2]** We have not directly addressed the question of whether *Pickering* applies where the associational freedoms claimed to be infringed predominate over the freedom of speech per se. The now-entrenched *Pickering* balancing test stems from the proposition that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568. The test, stated simply by the Supreme Court, requires courts "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The *Pickering* analysis involves a two-pronged inquiry: 1) whether the speech that led to the adverse employment action relates to a matter of "public concern"; and 2) whether, under the balancing test, the public employer can demonstrate that its legitimate interests outweigh the employee's First Amendment rights.

A review of our sister circuits' consideration of *Pickering*, hybrid rights and related issues is instructive. In a case that closely parallels our own, the Second Circuit recently considered the relationship between First Amendment speech and associational rights. *Melzer v. Bd. of Educ.*, 336 F.3d 185 (2d Cir. 2003). Melzer, a public high school teacher, was fired when it came to light that he was an active member of the North American Man/Boy Love Association, an organization that promotes pedophilia. The court noted that the case was unusual in that "the activity which prompted the [School] Board to fire Melzer was not a specific instance of speech, or

As the Supreme Court emphasized in *Waters v. Churchill*, 511 U.S. 661, 671 (1994), there is no conflict between the application of heightened scrutiny to restrictions on the speech of private citizens and the *Pickering* balancing test to the speech of government employees: the government as employer indeed has broader powers to regulate speech than does the government as sovereign.

a particular disruptive statement, but an associational activity of which speech was an essential component." *Id.* at 194.

Although it could be argued that, as with Hudson, Melzer was free to articulate his views so long as he did not associate in a way proscribed by his employer, the court stated that "[t]he root of the disruption at Bronx Science cannot be identified discretely as either Melzer's associational activities or the attendant speech, for the two are dependent on one another." *Id.* at 195. The court observed that the *Pickering* test had been applied by courts in other "hybrid" rights cases and then analyzed Melzer's claim under that standard. *Id.* at 195, 196-200.

The most problematic aspect of applying the *Pickering* balancing test to associational claims is the "public concern" component. Fifteen years after *Pickering*, in *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court fleshed out the meaning of "public concern." The Court drew a distinction between employee speech on "matters of public concern" and "matters only of personal interest." *Id.* at 147. The Court recognized that an assistant district attorney's speech related to official pressure to work on a campaign was a matter of public concern because it was "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149.

As the Second Circuit noted in *Melzer*, "[a]pplication of the public concern test is made awkward in [such a] case given the hybrid speech/associational nature of the rights involved." 336 F.3d at 196. In such circumstances, "an association engaged in advocacy may deliver many different statements at many different times and places and under many different circumstances. What statements, at what locations and in what context are the ones that should be analyzed is shrouded in uncertainty." *Id.* The Second Circuit ultimately sidestepped the problem, assuming that Melzer's association did involve

a matter of public concern and deciding that his claim failed anyway in the second step of the *Pickering* analysis. *Id.* at 196, 200.

Although *Connick* was a pure speech case, the Sixth Circuit has invoked the Supreme Court's line-drawing framework in an associational freedom claim. *Boals v. Gray*, 775 F.2d 686 (6th Cir. 1985). In *Boals*, the court zeroed in on *Connick*'s statement that:

> In all of these cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties *or other associations* that certain public officials might find "subversive."

*Id.* at 692 (quoting *Connick*, 461 U.S. at 144-45) (emphasis in *Boals*). Recognizing that although *Pickering* and *Connick* both involved freedom of speech, the court underscored that both cases "are based upon freedom of association cases." *Id.* Consequently, in *Boals*, the court "perceive[d] no logical reason for differentiating between speech and association in applying *Connick* to first amendment claims . . . ." *Id.*

Two circuits—the Seventh and Eleventh Circuits—have expressed concern that the *Connick* test does not adequately protect associational claims that do not fit neatly within the bounds of "public concern." Although the Seventh Circuit is "firmly in the camp of those circuits that [apply] *Connick* to associational claims," *Balton v. City of Milwaukee*, 133 F.3d 1036, 1040 (7th Cir. 1998), one panel expressed misgivings that the *Connick* public concern test may not adequately protect freedom of association for public employees "because some associational choices—for instance, whom to marry— are purely private matters." *Id.* at 1039. These private associa-

tional matters often would not qualify as matters of public concern and, therefore, would not be protected from retaliatory action under the *Connick* test.

The Eleventh Circuit explicitly rejected the application of the *Pickering*/*Connick* approach in *Hatcher v. Board of Public Education*, 809 F.2d 1546 (11th Cir. 1987). In *Hatcher*, a former school principal argued that she had been reassigned in part because of her association with parents and others who opposed the school closing plan that had eliminated her position as principal, and because "she brought her minister and a school board member to her meeting with the assistant superintendent." *Id.* at 1557.

The court declared that it did

> not view *Connick* as a retreat from *NAACP v. Alabama*, [357 U.S. at 460-61], in which Justice Harlan wrote for the Court: "it is immaterial whether the beliefs sought to be advanced by association pertains to political, economic, religious or cultural matters . . . state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

*Id.* at 1558. Without offering a rationale for distinguishing between speech and associational claims, the Eleventh Circuit nonetheless concluded that *Connick* "is inapplicable to freedom of association claims." *Id.*

**[3]** Bearing in mind the Supreme Court's seminal public employee speech cases and their application in cases from the other circuits, we conclude that *Pickering* should be applied in this hybrid rights case. The speech and associational rights at issue here are so intertwined that we see no reason to distinguish this hybrid circumstance from a case involving only speech rights.

Hudson's claim does not pose the difficulty identified in *Melzer*—the diffuse nature of some associations and some associational claims. *Melzer*, 336 F.3d at 196. Unlike *Melzer*, where the activity was ongoing membership in an organization, the associational right that was allegedly infringed by the College was easily identifiable in scope. Hudson's targeted association with her students is unlike belonging to an advocacy organization that may issue "many different statements at many different times and places and under many different circumstances." *Id.* Rather, Hudson and her students sought to participate together (association) in a single event that was clearly political in nature (speech). Thus, the application of the *Connick* public concern test is much easier here because the association in question involves a discrete event with a political orientation.

### B.   APPLICATION OF *PICKERING* TO HUDSON'S FIRST AMENDMENT CLAIM

#### 1.   PUBLIC CONCERN

[4] The threshold issue we address is whether Hudson's WTO protest activity involved a matter of public concern. The Supreme Court provided guidance on this point in *United States v. National Treasury Employees Union*, explaining that it had

> applied *Pickering*'s balancing test only when the employee spoke *as a citizen* upon matters of public concern rather than *as an employee* upon matters only of personal interest. Thus, private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer.

513 U.S. 454, 466 (1995) (internal alterations, quotations, and citations omitted) (emphasis in original).

**[5]** Although the Court recently acknowledged that "the boundaries of the public concern test are not well-defined," *City of San Diego v. Roe*, 125 S.Ct. 521, 525 (2004), this case does not require us to explore the outer perimeters of the definition: "the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present." *Id.* Thus, a "public concern is something that is a subject of legitimate news interest." *Id.* at 525-26.

**[6]** The WTO meeting and the issues surrounding it were quintessentially matters of public concern. That this event was newsworthy and had quite literally excited widespread public interest was not in dispute. Nothing in the record suggests that Hudson sought to associate with her students at the rally to voice any particular personal or private concerns. Instead, her stated purpose in participating in the demonstration was to express, in association with some of her students, her opinions about the role of the WTO in the global economy. Hudson's speech and associational activities meet the public concern test.

### 2.  BALANCING TEST

**[7]** Hudson's claim fails because her associational interests in this context are strongly outweighed by the legitimate administrative interests of Clark College. While Hudson's freedom to participate in discussion about the WTO surely implicates core political speech, the actual curtailment of her First Amendment rights was minimal. Hudson was free to attend the anti-WTO rally on her own. She was free to communicate her views on the WTO to her students or to anyone else. She was free to associate with her students in the classroom on this matter. The only claimed abridgement of her First Amendment rights was that she was not permitted, under the de facto auspices of the College, to associate with a handful of students during a discrete event for a limited duration.

**[8]** The burden on Hudson's First Amendment rights surely would have been problematic were she barred from ongoing participation in WTO advocacy or barred from general meetings outside the classroom with students interested in WTO issues. We acknowledge the Supreme Court's admonition that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. Alabama*, 357 U.S. at 460. Nonetheless, it is unlikely that the efficacy of Hudson's advocacy was undermined by the limited restriction on associating with her students at the WTO rally.

**[9]** Clark College has identified compelling interests for restricting Hudson's association with her students at the anti-WTO protest—the safety of students and pedagogical oversight. In weighing these interests, we must evaluate "any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Waters*, 511 U.S. at 668 (internal quotations and citations omitted). The Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Id.* at 673. Thus, we give "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential." *Id.*

**[10]** Craven identified four legitimate interests of Clark College in imposing restrictions on Hudson's right of association:

(1) risks to students, particularly an underage group, and potential liability for the college, because of the reports of potential for violence;

(2) students who were not able to attend would not have the benefit of access and networking with teachers;

(3) mixing one's politics with one's professional responsibility in the classroom, which is a special trust; [and]

(4) marginal benefit from participating in the demonstration.

This litany boils down to two reasons—student safety and pedagogical oversight. While some of these justifications are more significant than others, on balance the legitimate interests of Clark College as an employer and educational institution outweigh those of Hudson to participate in the de facto field trip with her students.

### SAFETY RISK TO STUDENTS

[11] Clark College has a strong argument that its safety concerns were not the post hoc justifications for Hudson's firing that she claims they were. The justification proffered by the College was neither de minimis nor trumped up after the fact. Before the protest, the Vice President advised the faculty that her "major concern [was] the safety of students, as well as your safety." The College was aware of law enforcement's prediction about rioting and civil unrest, and a civil emergency was declared on the day of the protests. This concrete concern and cautionary approach, backed up by specifics, is easily distinguished from a situation where an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

**[12]** Hudson's argument that the College's fears "proved to be unfounded as none of the students who attended the rally even witnessed any harm to any individuals there, much less suffered any themselves" misses the point. The court is not called upon to make a retrospective analysis of the College's position, but instead to assess whether the stated justification for limiting Hudson's association was reasonable at the time. The Ninth Circuit has held that "courts should not require government employers to demonstrate that an employee's speech *actually* disrupted efficient office operation; rather, 'reasonable predictions of disruption' are sufficient." *Moran v. Washington*, 147 F.3d 839, 846 (9th Cir. 1998) (citing *Waters*, 511 U.S. at 673). The potential for violence at the rallies was more than a wild card and the College was more than reasonable in being apprehensive about its students and faculty together attending protests of such novelty and scale in the face of warnings about rioting.

## PEDAGOGICAL OVERSIGHT

**[13]** Clark College has a strong and recognized interest in maintaining its political neutrality as an educational institution. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) ("A school must also retain the authority to refuse . . . to associate the school with any position other than neutrality on matters of political controversy."). *Hazelwood* arose in a high school and not a community college setting, but that does not change the fact that the decision of a public institution of higher education to avoid sanctioned political entanglement is a judgment that is best left to the institution. Although we draw from *Hazelwood* the principle that educational institutions have a strong pedagogical interest in avoiding institutional association with potentially divisive political issues, we need not consider whether a college necessarily has the same leeway as a high school to preserve that neutrality.

The College's concerns about political entanglement were especially pronounced in Hudson's case because of the close

connection between the subject matter of her teaching and the political message of anti-WTO protesters. The field trip with her students, even though not billed as an "official trip," was closely linked with her classroom teaching. Craven testified that "those students who elect[ed] to go may [have] perceive[d] that they [were] having [an] advantage in terms of access to the teacher . . . [and] that others who elect[ed] not to go might not have [an advantage] because of the power relationship that teachers have."

**[14]** As Craven feared, the students who accompanied Hudson to the rally probably did have an advantage on the final examination. In one major essay question, Hudson offered three options, two about union critiques of the WTO and one about a video on the Asian financial crisis, a movie that she apparently offered as an alternative to WTO subject matter. Indeed, Hudson told students before the trip to pick up information in Seattle as it "might be on the test." Hudson's conduct directly violated Jackson's warning that "[t]here cannot be any connection [or] participation in this event to any grade or activity in the class" and "[s]tudents who do not participate in this activity cannot in any way be penalized in terms of grade or be required to do any extra activity to 'make up' for their lack of involvement."

As befitting a professor of economics, Craven testified that he was concerned with "the marginal benefit to the marginal cost" of the students taking a field trip to the anti-WTO rally. Craven, as the senior member of the department, opposed field trips for students in general because of the lost classroom time. In fact, he had a legitimate pedagogical interest in disputing Hudson's conclusion about the educational value of attending the rally. Although Hudson argues that she and her students were not engaged in an official Clark College field trip, it was apparent that regardless of the trip's label, Hudson viewed the experience as an educational opportunity for the students, one that she promoted through her teaching.

**[15]** Clark College has met its burden by demonstrating that its legitimate interests outweigh Hudson's interest in attending the anti-WTO rally with her students. The College did not impermissibly infringe on Hudson's First Amendment rights, and thus we need not reach the question whether Hudson's termination was otherwise justified under *Mt. Healthy*. The district court properly dismissed Hudson's § 1983 claim.[2]

**AFFIRMED.**

---

[2]The district court also was correct in dismissing Hudson's Washington law claim that the administrators "intentionally interfered with business expectancy between [Hudson] and Clark College by inducing or causing a termination of that business expectancy." Under Washington law, "[a] party cannot tortiously interfere with its own contract." *Reninger v. Dep't. of Corr.*, 951 P.2d 782, 788 (Wash. 1998).